## COUNTY OF DeKALB *v.* CITY OF ATLANTA.
## RIVERS *v.* CITY OF ATLANTA *et al.*

1. If the act of August 7, 1906 (Acts 1906, p. 121), providing for the change of county lines lying within the limits of incorporated towns and cities, by holding an election in such municipalities to determine within which of the counties the corporate limits should be entirely included, should be held to apply to the changing of county lines within the limits of municipalities which are county-sites, it would be violative

of the constitutional provision that "No county-site shall be changed or removed, except by a two-thirds vote of the qualified voters of the county, voting at an election held for that purpose, and a two-thirds vote of the General Assembly." Civil Code, § 5927.

2. In view of the rule that if an act of the legislature is subject to two constructions, one of which would make it constitutional, and the other of which would render it unconstitutional, the former will be adopted, and also the rule that usually general words in a statute are not treated as including the government or affecting its rights unless such an intent appears from the statute itself, the act of 1906 referred to in the preceding headnote is held not to apply to changing county lines lying within the limits of a municipality which is a county-site.

3. Where a legislative act is complete, but it provides for an election in a particular municipality in order to determine whether a change of a county line shall be made in accordance with its provisions, such an election is not legislative in its character, and an injunction to prevent its being held or carried into effect will not be denied on the ground that it is an effort to enjoin legislation.

4 Where it is sought to hold an election as being under the provisions of the act of 1906 (supra), and change a county line in accordance with the result thereof, without authority of law for so doing, one of the counties, a portion of the territory of which is involved in the attempted change of the county line may bring an action to enjoin it. The county commissioner of DeKalb county has authority, in the name of the county, to institute such a suit as that just mentioned.

5. Where by an act of the legislature the corporate limits of a county-site were so extended as to include territory lying in an adjacent county, and it was sought to change the county line so as to include the entire municipality in one or the other of the two counties, a citizen and taxpayer of the municipality thus extended could institute a proceeding to enjoin the election from being held and the county line from being changed in accordance with its result. The evidence showed that the plaintiff Rivers had such an interest as entitled him to file the petition in this case.

6. While generally the holding of an election is a political matter and will not be enjoined, and a court of equity will not ordinarily enter into a consideration of the details or irregularities in an election, and take the place of the ordinary methods of contesting the result, yet where it is sought, without authority of law, to hold a municipal election for the purpose of changing a county line and to carry into effect the result of the election so held, injunction will be granted at the instance of one entitled to institute a proceeding for that purpose.

7. It does not appear that the acts sought to be enjoined have already been completed. If it may be inferred from the record that the election has been held, other things are necessary to be done in order to change the county line under the terms of the act of 1906, by virtue of which it was sought to hold the election. Injunction, therefore, can not be denied on the ground that the acts sought to be enjoined have already been done.

Argued May 3,—Decided June 18, 1909.

Petitions for injunction. Before Judge Ellis in the one case, and Judge Pendleton in the other. Fulton superior court. February 15, March 16, 1909.

The County of DeKalb brought an equitable action against the City of Atlanta, seeking to enjoin the defendant, its officers, mayor, council, clerk, and agents from holding an election to determine whether all the territory included within the corporate limits of Atlanta should lie in the County of Fulton or the County of DeKalb, under an ordinance which had been passed for that purpose, "or taking any other steps to carry out said ordinance," and from doing "each and every of said enumerated acts or any like acts." It was alleged that the defendant had passed an ordinance for the purpose of holding an election of the character indicated, that it was the intention to hold such an election, and that the defendant and its clerk claimed authority so to do under the act of 1906, "and thereafter to change said county line as provided in said act, or attempt so to do." The City of Atlanta as incorporated was wholly in the County of Fulton prior to 1908. In 1906 an act of the General Assembly was passed, entitled, "An act to provide for the change of county lines lying within the limits of incorporated towns and cities, and for other purposes." Acts 1906, p. 121. In 1908 the General Assembly passed an act amending the charter of the City of Atlanta for the purpose of extending the corporate limits over certain territory lying within the County of DeKalb, including the town of Edgewood, except a small section thereof which had been added to the town of Kirkwood. Acts 1908, p. 383. Both of these acts were attacked as being invalid. Various grounds of unconstitutionality were set up in regard to the act of 1906. It was also alleged that the registration for the purpose of holding the election was illegal, and that the ordinance was illegal, for reasons set out. It was averred, that if the result of the election should be ascertained to be in favor of changing the boundary line between Fulton and DeKalb counties, so as to include the City of Atlanta wholly within the County of Fulton, "then all the territory of DeKalb county now included in the extended corporate limits of Atlanta, as described in such extension act of August 15, 1908, will be taken from DeKalb county and included in Fulton county;" that in the event of either county losing its urban terri-

tory by reason of the election, such county would be seriously embarrassed in complying with its obligations and in carrying out its lawful undertakings, and rendered unable to discharge its duties to the State imposed by the constitution; that the County of DeKalb has incurred large necessary expenses; that the territory in question amounts in value to about one third of the whole county, and if taken from that county a casual deficiency in revenue would arise amounting to more than one fifth of one per cent. of the whole, and would cause a large increase in taxation; that the territory of DeKalb county involved contains a population of about 5,000 people and taxable values of a million dollars or more; that much complication would arise in regard to the payment of taxes, the service of jurors, the attendance of witnesses, the venue of suits, and other matters; and that the plaintiff has reason to fear that the revenues of the county would be substantially reduced or delayed in collection, and that the collection of taxes would be resisted, and a multiplicity of lawsuits entailed upon the county. The defendant denied that the act of 1906 or the act of 1908 was unconstitutional or invalid, or that there was any invalidity in the ordinance calling the election, or in the registration or preliminary steps taken for the purpose of holding it; and contested the right of the plaintiff to the injunction sought. On the hearing the presiding judge refused an interlocutory injunction, and the plaintiff excepted.

J. R. Rivers, alleging himself to be a citizen and taxpayer and one entitled to qualify as a voter of the County of DeKalb, and that he owns property in that part of DeKalb county which is sought to be included in the extended limits of the City of Atlanta, filed a similar proceeding in equity to that above mentioned. To this proceeding the county commissioner of DeKalb, the commissioners of roads and revenues of Fulton county, the City of Atlanta, its mayor, members of its board of aldermen, and the members of the city council were made parties defendant. This petition also set out various grounds of attack on the act of 1906, that of 1908, the registration of voters for the contemplated election, the ordinance adopted by the municipal authorities of the City of Atlanta, and the proceedings preparatory to holding the election. The plaintiff alleged that he was interested in preserving his political status as a citizen of DeKalb county, and

that he was further interested as a taxpayer called upon to contribute to the support of the city government of Atlanta, and to bear his share of the expense of holding the election and of carrying out its results, and as a taxpayer was interested in having it determined in what county he should pay his taxes: He prayed, that the defendants be enjoined from holding the election, from consolidating the votes cast thereat, and from canvassing the returns and declaring the result; that the mayor and clerk of the City of Atlanta be enjoined from certifying the result to the county authorities of Fulton and DeKalb counties; that the board of commissioners of Fulton county and the individuals composing it and the commissioner of DeKalb county be enjoined from receiving the certificate of the result of the election, "and that they likewise be restrained from proceeding to adjust and mark out the lines between Fulton and DeKalb counties; and that the City of Atlanta be enjoined from holding the election, declaring the result, certifying it," and from taking any part in readjusting and marking the lines between Fulton and DeKalb counties, and from paying out any money on account of any expense incurred touching such election.  On the hearing the interlocutory injunction was refused, and the plaintiff excepted.

*Alexander & Candler, Alonzo Field, L. J. Steele,* and *J. D. Kilpatrick,* for plaintiffs.

*W. P. Hill, J. L. Mayson,* and *L. Z. Rosser,* for defendants.

ATKINSON, J.  These two cases were argued together.  In both. an attack was made on the effort to change the county line between Fulton and DeKalb counties so as to include the entire territory lying in the corporate limits of the City of Atlanta in one county or the other, by means of holding an election under the act of 1906 (Acts 1906, p. 121), and putting into effect the change of line according to the result of such election.  Numerous grounds were alleged as a basis for the injunction sought in each case, but under the view which we take it will not be necessary to discuss all of them.

1.  By the act of 1906 provision was made for the change of county lines lying within the limits of incorporated towns and cities, by holding a municipal election to determine in which county the town or city should be included, and changing the county line according to the result of such election.  Up to 1908.

the corporate limits of the City of Atlanta were entirely within Fulton county. By an act of the General Assembly passed in that year they were so extended as to include certain territory in the adjacent county of DeKalb, in a part of which was located the municipality of Edgewood. Atlanta is the capital of the State, and the county-site of Fulton county. Does the act of 1906 apply to a situation like this, so that under it an election may be held whereby the county-site of one county may be entirely eliminated therefrom, and included in a different county? If it should be construed to apply to such a condition, would it not be thus far unconstitutional? We will take up these questions in the reverse order. A county-seat has been defined thus: "A county-seat or county-town is the chief town of a county, where the county buildings and courts are located, and the county business transacted." Black's Law Dic. In Matkin v. Marengo County, 137 Ala. 155 (34 So. 171), Dowdell, J., said (p. 164): "The terms 'courthouse site' and 'county-site,' in their ordinary use, mean the same thing, and are taken and understood to signify the seat of government of the county." Whether the terms county-seat, county-site, and seat of justice are generally used as synonymous, or whether for certain purposes a distinction may be drawn between them, is immaterial in the present discussion. The expression "county-site," which is generally employed in the law of this State, certainly indicates the place where the county business is transacted, where the court-house is located, and where the superior court for the county is held. The Political Code, §353, provides that the ordinaries (county commissioners where they exist and that duty has been devolved upon them) shall designate the rooms in the court-house to be occupied by each of the county officers. The clerk of the superior court is required to keep his office and all things belonging thereto "at the county-site and at the court-house, unless impracticable from any cause, when, by special permission of the ordinary, it may be kept at some other designated place not more than one mile therefrom, of which public notice must be given." Civil Code, §4360. Ordinaries are required to keep their office at the place and in the manner prescribed for clerks of the superior court, and must hold their courts at the place prescribed for the superior courts, or in their offices. Civil Code, §4231. The sheriffs must

keep their offices at the same place. Civil Code, §4377. Under section 5455 of the Civil Code, "no sales shall be made, by the sheriffs or coroners, of property taken under execution, but at the court-house of the county where such levy was made," except in certain cases for which special provision is made. Adminstrators' sales generally, unless by special order, are required to be made "at the place of public sales in the county having jurisdiction of the administration." Civil Code, §3452. The registration act of 1894 (Political Code, §61) made special provisions in elections for one offering to vote "at the precinct at the court-house, at the county-site, whose name does not appear on the lists for that ward or militia district," etc. The constitution (art. 6, sec. 4, par. 8) declares that "The superior courts shall sit in each county not less than twice in each year, at such times as have been or may be appointed by law." Civil Code, §5849. The legislature has declared that the superior courts shall be held in each county in the respective circuits twice in each year, except in certain instances where more than two terms are provided for, "at the several times prescribed by law." Civil Code, §4340. And again, the legislature has enacted that "Said judges must hold the superior courts of each circuit at the county-site and court-house (if any) of each county, or other place therein designated by law, twice each year, at such times as are now or may be prescribed by the General Assembly." Civil Code, §4315. Acts in regard to holding more than two terms in a year in certain counties are not material to the present consideration. Other instances might be given. But this will suffice to show that the county-site in this State is the place where the court-house and county buildings are required to be located and courts held and county business transacted. Each county must therefore have a county-site in order that the public business may be transacted as required by the constitution and laws. This is recognized in the constitution by making provision as to the manner in which a county-site can be changed. Whatever might be the legislative power in regard to the creation of new counties or dissolution of those existing, or in regard to changing county lines and county-sites, in the absence of constitutional provisions on those subjects, the constitution of this State deals with them in such manner that the legislative power in regard to them is limited. By the constitution, article 11, section 1, paragraph

2 (Civil Code, §5925), it is declared that "No new county shall be created." By paragraph 3 (Civil Code, §5926) it is declared that "County lines shall not be changed, unless under the operation of a general law for that purpose." Paragraph 4 (Civil Code, §5927) reads: "No county-site shall be changed or removed, except by a two-thirds vote of the qualified voters of the county, voting at an election held for that purpose, and a two-thirds vote of the General Assembly." Under these constitutional limitations, how could the legislature provide for an election to be held for the purpose of changing county lines in such manner as might result in leaving one county entirely without a county-site, and including this county-site, with its court-house, public buildings, and offices where the county business must be transacted within the limits of any other county? The whole intendment of the law is that the county business shall be transacted in the county. It was never contemplated as a possibility that the county-site of one county should be located in another; or that a county might contain within its borders two county-sites, one for itself and one for another county. It has been said that "The county-seat of an old county need not be made the county-seat of a new county, or indeed of any county, new or old, in which such county-seat may be placed by a change of county lines, or by a creation of a new county, since, if this were the case, a county might by such change of county lines have two or more county-seats." 11 Cyc. 368. The effect of including the county-site of one county within the territorial limits of another by a change of line would necessarily be to abolish it as a county-site, and thus leave the county from which it was taken without any county-site. 7 Am. & E. Enc. L. (2d ed.) 1045. By the constitution divorce cases are required to be brought in the county where the defendant resides, if a resident of this State. Civil Code, §5869. Cases respecting titles to land shall be tried in the county where the land lies. §5870. Equity cases shall be tried in the county where a defendant resides against whom substantial relief is prayed. §5871. Cases of the character just above referred to, as well as criminal cases where the offender is subject to loss of life or confinement within the penitentiary, are within the exclusive jurisdiction of the superior court. Civil Code, §5842. As we have already seen, the superior court must be held at the county-site of the county, and this

necessarily involves a trial of cases of that character in the county. If the legislature, either by direct act or by submitting the question to a vote of the voters of a municipality, could permit a county line to be so changed as to include the county-site of one county within the limits of another, leaving the latter without any county-site, it would be plainly impossible to carry out these constitutional provisions, at least until such time as a new county-site could be provided for the old county thus bereft. The constitution nowhere provides for this to be done. If it could be done, the county from which the county-site had been taken would remain without any county-site, and without the ability to have public business transacted in the manner provided by law, until two thirds of the voters of the county could fix a new county-site and two thirds of the General Assembly should approve it, which might require a considerable length of time or might never be accomplished, even if a new site could thus be supplied. If the legislature could provide for transferring the county-site of one county to the territory of another, and then by mere legislative enactment create a new county-site, the constitutional restriction on this subject would be of little practical binding force. It was argued that the prohibition of the constitution, that "no county-site shall be changed or removed," except in the manner provided, had no application to the changing of a county line so as to include a county-site within the limits of another county, but referred to the removal of the county-site from one location within the territory of a county to another location also within its territory. In the paragraph of the constitution under consideration the words "change" and "remove" are both employed, and it may be presumed that they were not used as identical in meaning, but that the constitutional convention intended not only to prohibit a removal of the county-site from one locality to another in the ordinary method, but also to inhibit any change which might work or necessitate a like result. It may be noticed that in paragraph 3, which immediately precedes the one under discussion, it is declared that the county lines shall not be "changed," while in that which next follows it is declared that no county site shall be "changed or removed," thus indicating a conscious difference between the use of one of these terms and both of them. It would not be constitutional for the legislature to destroy a county-site

by cutting it out of the limits of a county and thus compelling a creation or location of a new county-site. Such an enactment, we think, would be a violation of the letter of the constitution, and certainly would be prohibited by necessary implication from its terms. If, then, the legislature could not by direct enactment change a county line so as to include the county-site of one county within the territorial limits of another, it could not do so by submitting the question of such alteration of county lines to a vote of the people of the municipality itself. It will be observed also that the constitution provides that, in order to effect a change of a county-site, there must be a two-thirds vote of the voters of the county. Civil Code, § 5927. If such a change could be effected or compelled by an election under the act of 1906, it would require only a majority of the votes in the municipal corporation, some of the voters residing in one county, some in another, the former forming only a fraction of the voters of the county whose county-site would thus be abolished.

It was urged, that if the election should result in declaring that Atlanta should be included in DeKalb county, this constitutional difficulty might arise, but if it should result in Atlanta remaining in Fulton county, and a portion of DeKalb county being added thereto, there would be no destruction of a county-site, or cutting it off and including it in another county, and therefore the constitutional question which has been discussed would not become material; that the plaintiffs should await the result of the election before it could be determined whether this ground of complaint existed; and that if the election resulted in favor of annexing a part of DeKalb county to Fulton, it would not arise at all. An election implies a choice. There can be no choice which can only result one way. An election is merely so in name, and not in fact, if it is held legal provided it results in favor of one contention, but illegal if it results in favor of the other. In order for an election to be constitutional and its result to be capable of constitutional enforcement, it must be constitutional without regard to which side wins. If, therefore, an act for the submission of the question of whether a county-site should remain in its own county and have a part of another county added to it, or whether the entire county-site should be included in the other county, can not be held constitutional if the result of the election should be one

way, it can not be held to be constitutional if the result should be the other way. The proposition is whether the submission of a question to an election or choice of the voters and the carrying out of their selection or choice, whatever it may be, is constitutional. In *Mayor &c. of Macon* v. *Hughes,* 110 *Ga.* 805 (36 S. E. 251), it was said by Mr. Justice Cobb: "The safer and better rule in such a case is to deal with the parties, not so much on the theory of what they may or will do, but on what they can do." If we have demonstrated that such an election and its results would be unconstitutional if the majority of the voters voted one way, it follows inevitably that such an election would be unconstitutional regardless of how they voted. Much reliance was placed by the defendants in error on the decision in *Manson* v. *College Park,* 131 *Ga.* 429 (62 S. E. 278). That case decided that the act of 1906 was not unconstitutional as referring to more than one subject-matter in its title, nor as containing matter in the act itself different from that expressed in its title; also that it was not a special but a general law, and therefore not in conflict with that provision of the constitution which declares that county lines shall not be changed unless under the operation of a general law for that purpose, nor with the one which declares that no special law shall be enacted in any case for which provision has been made by an existing general law. On the points there determined that decision is controlling; but the question above discussed was neither made nor decided in that case. As was said in *Hall* v. *Tarver,* 128 *Ga.* 410 (57 S. E. 720), "it is not a good objection to an attack on a statute, because of its unconstitutionality for given reasons, that the same statute has been held by the court not to be unconstitutional for another reason." The decision in *Reid* v. *Eatonton,* 80 *Ga.* 755 (6 S. E. 602), by two Justices, was also relied on to sustain the doctrine that a court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and who therefore has no interest in defeating it. Undoubtedly courts will not decide mere moot cases, made by parties without any interest, to determine the constitutionality of an act of the legislature. But, as we shall endeavor to show later in this opinion, both the County of DeKalb and Rivers are parties interested. They are not mere strangers. While in the case last mentioned the points wherein it differs from the present case may

not have been fully developed, they are substantial in character. The real matter of complaint in that case was this: Under an act authorizing the holding of an election for raising a school fund and its distribution, an election had been held resulting in favor of the bond issue, and the trustees of the white and colored schools had agreed in writing as to the proportion to be received by each school. The bonds were advertised to be sold. Reid, a white citizen and taxpayer, sought to enjoin their sale, on the ground that the amount agreed to be received by the colored school from the sale of the bonds did not, and under the act could not, exceed the pro rata taxes paid into the treasury by the colored people. Thus the colored people were satisfied and not complaining. The limitation as to what they should receive was contained in a proviso, which perhaps might have been declared unconstitutional without affecting the general constitutionality of the act. If the act providing for the issue of the bonds was constitutional, but there was a proviso which might have been declared unconstitutional without affecting the entire act, and the parties who might have complained of it were satisfied with it, and with the agreement made under it as to what they should receive, Reid had no right to have the entire bond issue enjoined on that ground. If an act would be unconstitutional as a whole, and an election under it could not lawfully be held at all where a county-site was involved, it would be no answer to a proceeding by an interested party to say that the election, if held, might result in adding territory to one county instead of the other. Without discussing whether the addition of a large city, with both its property, its expenses, and its responsibilities and burdens, to a comparatively small county would necessarily be beneficial to the latter, the distinction between the want of authority to hold such an election, and the division of funds under a proviso in the act involved in the *Reid* case, is plain.

2. If, therefore, the act of 1906 should be construed as applying to the holding of an election for the purpose of changing a county line, which might involve the cutting off of a county-site from its county and including it in another, to that extent it would be unconstitutional. It is a well-settled rule that if an act of the legislature is subject to two constructions, one of which would make it constitutional, and the other of which would make it unconstitutional, the former will be adopted. For this

reason we should be much inclined to construe the act of 1906 as not intended to apply to cases where a county line passes through the corporate limits of the county-site of one of the two adjacent counties. But this reason does not stand alone. Usually general words in a statute are not treated as including the government or affecting its rights, unless such an intent appears from the statute itself. State *v.* Milburn, 9 Gill (Md.), 105; Dollar Savings Bank *v.* U. S., 19 Wall. 227 (22 L. ed. 80); 1 Bl. Com. 261, 262; U. S. *v.* Hewes, 26 Fed. Cas. 297, No. 15,359; U. S. *v.* Hoar, 26 Fed. Cas. 329, No. 15,373; *Lingo* v. *Harris,* 73 *Ga.* 28; *Brooks* v. *State,* 54 *Ga.* 36; U. S. *v.* Herron, 20 Wall. 251 (22 L. ed. 275); *Mayor &c. of Brunswick* v. *King,* 91 Ga. 522 (17 S. E. 940); *Fears* v. *State,* 102 *Ga.* 281 (29 S. E. 463). This principle has been codified (Pol. Code, §3) in the following words: "The State is not bound by the passage of a law, unless named therein, or unless the words of the act should be so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature." See also *Butler* v. *Merritt,* 113 *Ga.* 238 (38 S. E. 751). We have already shown that the construction of the act of 1906 contended for by the defendants in error as being applicable to county-sites would not only tend to restrain or diminish the powers, rights, and interests of the sovereign, the collection of its revenues in the manner pointed out by law, and the administration of justice by its courts, and would affect and hamper, at least for a time, the whole plan of administering the laws in a county; but in the particular instance before us, where the City of Atlanta, the capital of the State, and its location in Fulton or DeKalb county is involved, the argument is even stronger. Prior to the lease of the Western & Atlantic Railroad, when it was operated by the State, it was declared that suits against that road must be brought against the superintendent in his official capacity in the county of Fulton; and this law still remains in the Political Code, §1031. By the act of 1907 (Ga. Laws 1907, p. 80) the domicil of the railroad commission of Georgia was fixed at the Capitol of the State, "in Atlanta, Fulton county," and it was declared that "no court of this State, other than those of Fulton county, shall have or take jurisdiction in any suit or proceeding brought or instituted against said commission or any of its orders or rules." While this act was passed after that of 1906, it nevertheless indicated the legislative contem-

plation that the capital and the county-site of Fulton county should remain in Atlanta in that county, and was inconsistent with the idea that Atlanta could be transferred from Fulton to DeKalb county. If this could be done, where could suits be instituted against the commission under the act of 1907? In the light of what has been said, we hold that the act of 1906 has no application to a case in which a county line passes through the corporate limits of a municipality which is the county-site of one of the two counties.

3.  Counsel for the defendants argued that injunction would not lie in this case, because courts would not undertake to restrain the legislature from passing an act, and that a submission of the question to a vote was in the nature of completing the enactment, or was legislative in its character. This argument is not sound. The legislature has enacted the law, and there is no injunction sought against legislation. The determination of whether or not an election should be held and the result of it put into effect in a given locality by virtue of authority claimed under such act, and whether in fact the act confers such authority, or would be constitutional if it sought to do so, and whether such an effort would be enjoined, is a different thing from enjoining legislation.

4.  It was argued that neither the County of DeKalb nor Rivers had any right to bring this action; and as to the county it was further contended that Freeman, who was the sole county commissioner under the law touching that county, had no authority to direct such suit to be brought. The constitution of this State (Civil Code, §5924) declares that "Each county shall be a body corporate, with such powers and limitations as may be prescribed by law. All suits by or against a county shall be in the name thereof; and the metes and bounds of the several counties shall remain as now prescribed by law, unless changed as hereinafter provided." Three points comprehended in this section should be noted in connection with the present case: first, that each county is not merely a division, but is a body corporate; second, that the constitution contemplates the existence of power in a county to sue or be sued; third, that the metes and bounds of the counties shall remain unchanged, except in the manner provided by law. If a county is a body corporate, with power to sue, no express limitation is put upon the class of subject-matters in respect to which that power

can be exercised. If the county has a right which it becomes essential to enforce by process of law, or a wrong is being done which will be detrimental to the county and its interests, why should it not be allowed to enforce the right or seek a remedy against the wrong? The County of DeKalb now has jurisdiction over the territory involved in this controversy. From the property therein taxes are collected, and it furnishes county revenue. It exercises dominion over the roads and the working of them and may collect road tax, if the alternative road law is or should be put in force. If there are persons residing in that territory exercising any business which requires a county license, this payment furnishes a further source of revenue. Jurors are drawn from citizens there. It forms now an integral part of DeKalb county, subject to its management, control, and any revenue or benefit derivable therefrom. It can not be that a county must submit to have such portion of its territory unlawfully taken from it and transferred to another county, without being able to contest the legality of the proceeding. The County of DeKalb could bring the suit. If a county can sue and be sued, who shall determine whether a suit shall be brought or resisted, if not the official or officials having general charge of county matters? By the act of August 21, 1906 (Acts 1906, p. 405), the general management of such affairs in DeKalb county was placed in the hands of a single commissioner, and among other powers conferred upon him were "generally to exercise all the powers heretofore vested by law in the ordinary when sitting for county purposes, and to have and to exercise such other powers as are granted by law or as are indispensable to complete and proper jurisdiction over county finances and county matters." Under this, Freeman, the county commissioner, had authority to cause the action to be brought in the name of the county to prevent its unlawful dismemberment, and a proceeding which might result in the attaching of a portion of its territory to Fulton county, and to enjoin a proceeding for that purpose which was not authorized by law.

5. In the other case Rivers alleged that he was a citizen and taxpayer of DeKalb county, residing in that portion of the county which it was proposed should be attached to Fulton county, if the election should result in that way; and also that he was interested in preserving his political status as a citizen of DeKalb county

and as a taxpayer called upon to contribute for the support of the city government of Atlanta, and to bear his share of the expenses of holding such election and of carrying out its result, and as a taxpayer in having it determined in what county he should pay his taxes. The first of these allegations was directly admitted by Freeman, one of the defendants, and the others were admitted by him on information and belief. The other defendants answered that they could neither admit nor deny these allegations, for lack of sufficient information. Rivers testified by affidavit, that he lived in that part of DeKalb county which was included in the corporate limits of the City of Atlanta by the act of 1908; that he was entitled to qualify as a voter of DeKalb county; that he was the owner of personal property located at his place of residence, subject to tax; that he owned no property elsewhere in DeKalb county; that the taxes assessed against him for the year 1908 for the State and county amounted to $12.05, which had been paid. A tax fi. fa. against him for the year 1908 was introduced in evidence for the amount of $12.05, which was marked paid on February 16, 1909. A receipt for taxes given by the tax-collector of DeKalb county to Rivers was also introduced, showing the payment of $12.05 in 1908. Also, a certificate from the tax digest in the office of the comptroller-general, showing his returns for the years 1905, 1906, and 1907, including some real estate, some personal property, and poll tax. In response to this, the defendants introduced evidence tending to show that certain real estate was assessed by the tax assessors of the City of Atlanta against Rivers for the year 1909, that a certain lot, which may have been the same lot, though not positively identified as such, was bought by Mrs. Maggie E. Rivers from one Brown, and that she received a bond for titles, which she subsequently surrendered, as being unable to pay for the land, and later took another bond for titles from the Fidelity Investment Company, which she likewise surrendered, and thereafter continued in possession of the house as a tenant of that company. If it be conceded that the lot thus referred to was the same as that which was assessed against Rivers by the tax assessors of Atlanta, it does not meet the fact that he also owned personal property in DeKalb county, which was taxable, and that he paid poll tax there. Besides, the City of Atlanta seems to be officially asserting a claim against him as a taxpayer, but denying his right.

to litigate on the basis of being such. Thus the plaintiff Rivers occupied such a status as authorized him to bring the suit.

6. It was contended that injunction should not be granted, even if there was a lack of authority to hold the election and enforce its results. Two principal arguments were made in support of this position: first, that the holding of an election was the exercise of a political function, and should not be enjoined; second, that it appeared that the time for the holding of the election was passed, and it could be gathered from the record that it had already taken place, and therefore the thing sought to be enjoined had already occurred. Hence it was said that this court would not reverse the refusal to grant the injunction. Generally the holding of an election is a political matter, and will not be enjoined; as, where two candidates are seeking election to an office. So, also, equity will not ordinarily enter into a consideration of the details or irregularities in an election, and take the place of the ordinary methods of contesting the result. But an election of the character here involved presents quite a different question. In *Mayor &c. of Macon* v. *Hughes*, supra, it was held that "Equity will enjoin municipal authorities from holding an election to determine whether a given territory shall be annexed to the city, when the ordinance calling the election was plainly ultra vires, and there was no warrant in law for holding the election." In the opinion Mr. Justice Cobb, while stating that there might be authority to the contrary, gave very weighty reasons why, on principle, the holding of an election of this character ought to be enjoined if unauthorized, and why the ruling differed from decisions touching mere questions of irregularity in an election apparently authorized, or from controversies in regard to elections to fill a public office. We do not perceive any reason to depart from the ruling in that case. If the City of Atlanta and its officers have no lawful authority to call or hold an election for the purpose of changing a county line; and if the result of the election, when held, can not lawfully be enforced; and if the only method of preventing an attempted enforcement, save by resisting each act separately after the illegal change has been put into effect, is by injunction, it is difficult to see why the entire proceeding can not be stopped in limine. Why should a municipality or its officers be permitted to go to the expense of holding an election for the purpose of

annexing territory or changing a county line, and pay such expenses, or others consequent thereon, out of money raised by taxation, when the declaration or announcement of its result, or the surveying of the line, under the constitution and laws of this State, can not have the slightest effect, or be put into execution? If the whole action is ultra vires, and calculated to impose burdens upon the individual citizen and taxpayer, or to unlawfully interfere with the rights of another county, why should it be allowed to proceed, merely to be enjoined later when sought to be put into effect? Indeed, if the plaintiffs had remained quiescent and had permitted the election to be held, the notices given, and the line between the two counties to be changed, and dominion over territory taken from one county to be exercised by the other, and perhaps expense incurred, and had then for the first time asserted that the entire proceeding was unconstitutional, would they not have been met with the contention that they were estopped, or that equity would not grant them relief because of laches in applying for its aid? In Ford v. Farmer, 9 Humph. (Tenn.) 152, it was held, where an act of the legislature directed that a county should be established, and commissioners were appointed for that purpose, and it appeared that the act was unconstitutional and void, that a court of equity would restrain, by injunction, the commissioners from organizing the county. See also *Town of Roswell* v. *Ezzard*, 128 Ga. 43 (57 S. E. 114); *Mayor of Americus* v. *Perry*, 114 Ga. 871 (40 S. E. 1004, 57 L. R. A. 230); *Smith* v. *Magourich*, 44 Ga. 163; Bradley v. Commissioners, 2 Humph. 428 (37 Am. D. 563); Segars v. Parrott, 54 S. C. 1 (31 S. E. 273).

7. If it may be inferred that the election has been held, still that is not a completion of the acts necessary to be done in order to change the county line, under the terms of the act of 1906; and there is nothing here to show that all the acts sought to be enjoined have already been done. The legislature act referred to provides, that, after the election shall have been held and the result certified, certain enumerated acts shall be done by the municipal and county authorities to carry it into effect, including publication for four months in a public gazette in each county, "and thereupon the new line or lines shall be held to be the established line in lieu of the original line or lines." If the election has not taken place, the entire proceeding should be enjoined; if it has

taken place, and the result has been declared, further proceedings for the carrying of it into effect by changing the county line and incorporating the territory of one of the counties into that of. the other should be enjoined.

The demurrers have not been considered and passed on as such, but have been before the court as part of the cause shown against the grant of an injunction. Under what has been said above, it is unnecessary to deal with them in detail.

*Judgment reversed. All the Justices concur.*