(128 So. 362)

**WILKINSON v. HENRY, County Treasurer, et al.**

6 Div. 603.

Supreme Court of Alabama.

April 17, 1930.

Rehearing Denied May 22, 1930.

Horace C. Wilkinson and Crampton Harris, both of Birmingham, for appellant.

D. M. Powell, of Greenville, and Alex T. Howard, of Mobile, amici curiæ.

Robt. B. Evins and Forney Johnston, both of Birmingham, for appellee.

BROWN, J.

This appeal is from the order of the circuit court denying the complainant's application for a temporary injunction, sustaining the defendants' demurrer, and dismissing the bill. Among other grounds of demurrer sustained is the general demurrer going to the equity of the bill.

The bill is filed by a resident taxpayer of Jefferson county, seeking to restrain the defendants—the judge of probate, the clerk of the circuit court, and the county treasurer—from exercising their statutory powers and discharge the duties imposed upon them by the primary election laws (Code, §§ 437, 613, 616)—the judge of probate and the clerk of the circuit court from appointing inspectors and clerks for the several election precincts (Code of 1923, §§ 437, 613, 616)—the probate judge from procuring the necessary "election supplies" (Code, § 625)—and the treasurer from paying any expense incurred in respect to the holding of the primary election for the nomination of candidates by the Democratic Party for state, federal, district, party, and county offices, called by a resolution of the State Democratic Executive Committee, for nomination of state, federal, district, and party candidates, and by the county committee for the nomination of county candidates.

The equity of the bill, stated in the language of the pleader, is rested upon the following grounds: The resolution adopted by the State Democratic Executive Committee is "illegal, unconstitutional, null and void, for the following, among other reasons, separately and severally, that is to say:

"(1) Because the qualifications of electors entitled to vote in said proposed primary have been fixed by the committee different from the qualifications of candidates for nomination to State, Federal, Circuit and District offices and places on the State Executive Committee, contrary to the statutes of Alabama regulating primary elections, or

"(2) Because the State Executive Committee has illegally attempted to authorize the several county executive committees of the several counties in Alabama to fix the political qualifications of candidates for nomination to county offices in said primary, or,

"(3) Because the political qualifications prescribed for candidates for State, Federal, Circuit and District Offices, and membership on the State Executive Committee, or,

"(4) Because the State Executive Committee has illegally disqualified a large number of persons in said county from becoming candidates in said primary for nomination to State, Federal, District and Circuit offices, and membership on the State Executive Committee, or,

"(5) Because the resolution of the State Executive Committee violates the constitutional guarantee against retrospective laws.

"(6) Because the political qualifications prescribed by the State Executive Committee for candidates for State, Federal, Circuit and District offices, as also membership on the State Executive Committee, are arbitrary, unreasonable, illegal and beyond the power of said Committee to impose."

That the resolution being void, the proposed election is illegal, and it would be a misappropriation of public funds to allow the expenses incident thereto to be paid by the county.

■ Looking through mere form to substance, as it is the court's duty to do (Fairclough v. St. Amand, 217 Ala. 19, 114 So. 472), the major purpose of the bill is to enjoin the primary election, an election that is purely political, and the alleged threatened illegal expenditure of public funds is a mere incident in which the complainant has no interest, special or peculiar, differing in kind from the interest of all other taxpayers.

■ We are confronted at the very threshold of the case with the question of jurisdiction of a court of equity to interfere in such matters, and it is of no consequence that the parties have not stressed the point, and invite the court to consider the case on what they consider to be its merits. The question of jurisdiction is always fundamental. It would amount to usurpation and oppression for a court to interfere in a matter over which it has no jurisdiction, and its pronouncements in respect thereto would be without force, and its decrees and judgments would be wholly void. This is a universal principle, as old as the law itself; hence the question of jurisdiction is a question of primary importance in every case, and, if there is an absence of jurisdiction over the subject-matter, this ends the inquiry; it cannot be waived or supplied by consent. 7 R. C. L. 1029, §§ 57, 59, and 70; Power, Secretary of State, v. Ratcliff et al., 112 Miss. 88, 72 So. 864, Ann. Cas. 1918E, 1146; McAlester v. Milwee, 31 Okl. 620, 122 P. 173, 40 L. R. A. (N. S.) 576.

Professor Pomeroy, in his work on Equity Jurisprudence, recognized as an authority in all jurisdictions, states the rule thus: "An injunction will not issue, as a general rule, for the purpose of restraining the holding of an election, or directing or controlling the mode in which, or determining the rules of law in pursuance of which, an election shall be held. An election is a political matter, with which courts of equity have nothing to do. Moreover, the effect of interference in such matters might often result in the destruction of the government. This is especially so when the relief is sought to prevent the holding of an election. The attempt to check the free expression of opinion—to forbid the peaceable assemblage of the people— to obstruct freedom of elections if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous to the rights of the citizen. If the courts can dictate to the officers of the people that they shall not hold an election from fear of some imaginary wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate.' Thus, an injunction will not issue to restrain the holding of an election although it is alleged that it is without authority of law, or that the act authorizing it or providing for apportionment is unconstitutional. And the mere fact that the cost of the election will have to be borne by the state and indirectly by the tax-payers is no ground for an injunction at the relation of a tax-payer for the injury is too trifling." 4th Edition Pomeroy's Equity Jurisprudence, vol. 4, § 1753, page 4067.

Again, to quote from 10 Ruling Case Law, page 342, § 92: "Matters of a political character are also outside the pale of a court of equity, no such jurisdiction having ever been conceded to a chancery court, either in a federal or state judiciary, unless it is so provided expressly or impliedly by organic or statute laws. The political rights of a citizen are as sacred as are his rights to personal liberty or property, but he must go to a court of law for them. A court of equity is a one-man power, wielding the strong force of injunction, often issued at chambers, and on ex parte hearing. Neither in England nor America has this power been suffered to extend to political affairs." This text is sup-

ported by a host of authorities cited in note 9, among others Giles v. Harris, 189 U. S. 475, 23 S. Ct. 639, 47 L. Ed. 909, which involved the validity of the article on suffrage in the Alabama Constitution of 1901.

■ There is an absence of constitutional provisions or statute laws conferring · jurisdiction on courts of equity in this state to inquire into or enjoin elections of any sort, and, while it must be conceded that the election involved in this case does not fall within the provisions of section 549 of the Code, as that section has been construed and applied in the recent case of Dennis et al. v. Prather et al., 212 Ala. 449, 103 So. 59, still this section evinces a legislative policy that excludes the idea of establishing jurisdiction in courts of equity to enjoin elections by implication, where property or contract rights are in no way involved. This section (549) provides: "No jurisdiction exists in or shall be exercised by any judge, court or officer exercising chancery powers to entertain any cause or proceeding for ascertaining *the legality*, conduct or results of any election, except so far as authority to do so *shall be specially and specifically enumerated and set down by statute*," etc. (Italics supplied.)

High on Injunctions (4th Ed.) vol. II, § 1316, page 1333, states the rule to be that "Equity will not enjoin the holding of an election for a public office at the suit of citizens and electors who fail to show in what manner they will be injured by such election, either in person or property. Plaintiffs, in such case, are to be regarded as mere volunteers, having no right to invoke the extraordinary aid of equity in a matter in which they have no interest other than that which is common to the public at large. And such a case may be regarded as analogous to that of private citizens attempting to enjoin a public nuisance without showing some special injury, peculiar to themselves, and aside from the general injury to the public. Indeed, a still broader doctrine has been asserted and it has been held that, the power of holding an election being a political power, equity has no jurisdiction to restrain officers intrusted by law with the duty of holding elections from the exercise of such power." The first part of this text is rested upon a decision of this court, rendered more than a half of a century ago, the soundness of which has never been questioned. Jones v. Black, 48 Ala. 540. And the proposition set down in the last part of this text is sustained by the great weight of authority. McAlister, Secretary of State Education Board et al., v. State ex rel. Short, Attorney General, 95 Okl. 200, 219 P. 134, 33 A. L. R. 1370, and note beginning on page 1376.

The principle is applicable alike to general and primary elections. Meacham v. Young et al., 115 Ky. 246, 72 S. W. 1092, 1094, 24 Ky. Law Rep. 2141; Neal et al. v. Young et al., 75 S. W. 1082, 25 Ky. Law Rep. 183.

The election brought in question in Dennis et al. v. Prather et al., supra, was not only not authorized by law, but was prohibited by the statute, and involved not only the costs of the election, but the abandonment of county property, and the cost of building new county buildings, for which purpose the levy of a special tax was authorized, Code 1923, § 212; and the bill was filed "by John Prather, a taxpayer, and the board of revenue of the county." See County of De Kalb v. City of Atlanta, 132 Ga. 727, 65 S. E. 72.

In Petree v. McMurray, 210 Ala. 639, 98 So. 782, McMurray was the county superintendent of education, having been appointed for a term of two years, and, under the provisions of Const. 1901, § 175, was entitled to hold for the term and could not be removed therefrom except by impeachment. The equity of the bill in that case rested on the well-settled principle that a court of equity has jurisdiction to protect an incumbent in office who shows a prima facie right to continue therein. Wright et al. v. Cook et al., 216 Ala. 270, 113 So. 252.

In City of Mobile v. Mobile Electric Co., 203 Ala. 574, 84 So. 816, contract rights were the subject of the litigation, and it was expressly pointed out that the election was not a political one.

In Coleman et al. v. Town of Eutaw et al., 157 Ala. 327, 47 So. 703, the bill was to enjoin the issuance of municipal bonds, the election authorizing such issuance having been held. The equity of the bill was rested upon the jurisdiction of equity to prevent the abuse of corporate power and keep municipal corporations within subjection to the law. The jurisdiction in such case is well established. New Orleans, Mobile & Chattanooga R. Co. v. Dunn et al., 51 Ala. 128; Gillespie et al. v. Gibbs, 147 Ala. 449, 41 So. 868; Inge et al v. Board of Public Works of Mobile, 135 Ala. 187, 33 So. 678, 93 Am. St. Rep. 20.

The same principle applies to counties in the exercise of their corporate functions as municipal corporations. Kumpe et al v. Bynum et al., 158 Ala. 311, 48 So. 55.

■■ While the statutes impose upon the several counties of the state the financial burden of paying the expenses incident to general elections and general primary elections (Code 1923, §§ 481, 509, 609), the county in its corporate capacity has no function to perform in respect to such elections. The statutes are a mere legislative apportionment of the burden of government in applying the police power, and the officers named in the statutes as the board to appoint the election inspectors and clerks, and to supply the necessary election supplies and pay therefor, are but agencies of the state, designated and empowered by the Legislature to carry into effect the

258

state's policy in respect to such elections, and the rule of the great weight of authority is that a court of equity is without jurisdiction to control such officers in the exercise of their statutory authority in respect to political elections at the suit of a taxpayer who shows no special injury peculiar to himself. 32 C. J. 254, § 400; 4 Pom. Eq. Jurisprudence, §§ 1746, 1748, 1754; Power, Secretary of State, v. Ratliff et al., 112 Miss. 88, 72 So. 864, Ann. Cas. 1918E, 1146.

█ What we have said is sufficient to indicate that we are of opinion that the bill is without equity, and the decree of the circuit court denying the injunction, sustaining the demurrer, and dismissing the bill is free from error.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.

THOMAS, J., dissents.

SAYRE and BOULDIN, JJ., not sitting.

THOMAS, J. (dissenting).

The importance of the question presented for decision justifies a further expression of opinion to that which has been said.

The matter would have been simple had the State Executive Committee only followed the clearly expressed mandate of sections 612 and 672 of the Code, and prescribed like qualifications for electors and candidates. The duty of this court in the premises is merely to follow the law and declare its application upon the resolutions as to the rights of qualified electors and candidates.

It is established that, under our system of government, sovereignty is in the people. And as a practical or accomplished fact, it is intrusted to or resides in those persons, who, by operation of the Constitution and statutes, are permitted to exercise the elective franchise. This is an active or effective agency, result, or political influence—the substructure—on which the superstructure of government and its administrations really rest.

The regulation of elections, including the prescribing of qualifications for suffrage, is left by the Constitution of the United States to the several states, except as it is provided in 14th and 15th Amendments. These limitations or decisions thereon need not be enumerated or discussed.

It may be well, at this time, to say Mr. Wigmore, in his Ballot Reform American Law Rev., considered the constitutionality of new election laws that, properly safeguarded and administered, were subject to no constitutional objection. Primary Elections Merriam & O. 113. For note thereof and general authorities on constitutionality—of Australian Ballot Laws—see vol. 10, Am. & Eng. Ency. of Law, pp. 585, 586, and 587.

It is further established that the participation in the elective franchise is a privilege rather than a right that had been granted or denied on grounds of public policy. The prevailing views of courts and publicists being that it should, in the exercise, be as general as possible, and consistent with the public safety. It was not intended by the primary laws to intrude unreasonably upon domestic or party affairs of voluntary political organizations not agencies of the state; nor were such matters included or embraced within the organic law of the federal Constitution in declaring those who are qualified. 2 Cooley's Const. Lim. (8th Ed. 1927) 1360, 1368, 1370, 1376; United States v. Gradwell, 243 U. S. 476, 37 S. Ct. 407, 61 L. Ed. 857; Newberry v. United States, 256 U. S. 232, 41 S. Ct. 469, 65 L. Ed. 913; Garrett v. Cuninghame, 211 Ala. 430, 100 So. 845; Robinson v. Holman (Ark.) 26 S. W.(2d) 66.

Mr. Cooley declares of the general right to participate in the expression of the popular will as follows:

"While it is true that the legislature cannot add to the constitutional qualification of electors, it must nevertheless devolve upon that body to establish such regulations as will enable all persons entitled to the privilege to exercise it freely and securely, and exclude all who are not entitled from improper participation therein. For this purpose the times of holding elections, the manner of conducting them and of ascertaining the result, are prescribed, and heavy penalties are imposed upon those who shall vote illegally, or instigate others to do so, or who shall attempt to preclude a fair election or to falsify the result. The propriety, and indeed the necessity, of such regulations are undisputed. In some of the States it has also been regarded as important that lists of voters should be prepared before the day of election, in which should be registered the name of every person qualified to vote." * * *

"All such reasonable regulations of the constitutional right which seem to the legislature important to the preservation of order in elections. to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot-box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them absolutely essential." * * *

"All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void."

He rests this last statement of the general rules on many authorities, among which is

our decision in Gardina v. Jefferson County Board of Registrars, 160 Ala. 155, 48 So. 788; and further declares of the general regulatory statutes (safeguarding the due exercise of the franchise and secrecy thereof), as follows:

"These statutes are simply declaratory of a constitutional principle that inheres in the system of voting by ballot, and which ought to be inviolable whether declared or not. In the absence of such a statute, all devices by which party managers are enabled to distinguish ballots in the hand of the voter, and thus determine whether he is voting for or against them, are opposed to the spirit of the Constitution, inasmuch as they tend to defeat the design for which voting by ballot is established, and, though they may not render an election void, they are exceedingly reprehensible and ought to be discountenanced by all good citizens. The system of ballot-voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that no one is to have the right, or be in position, to question his independent action, either then or at any subsequent time. The spirit of the system requires that the elector should be secured then and at all times thereafter against reproach or animadversion, or any other prejudice, on account of having voted according to his own unbiassed judgment; and that security is made to consist in shutting up within the privacy of his own mind all knowledge of the manner in which he has bestowed his suffrage.' " 2 Cooley's Constitutional Limitations, (8th Ed.) under the sub-title of "The Expression of the Popular Will," p. 1376.

The constitutionality of primary election laws, as generally put into operation by the states, is sustained as being within the power of the Legislature to regulate, as it may, in dealing with voluntary political organizations that are not the direct and creative agency of the state, such as have been recognized, and as discussed in Smith v. Justice, 200 Ala. 483, 76 So. 425; State v. Sanders, 187 Ala. 79, 65 So. 378, L. R. A. 1915A, 295. Some of the state Constitutions (Alabama, § 190, Const. 1901; California, Heney v. Jordan, 179 Cal. 24, 175 P. 402) expressly authorize or require the enactment of laws, to the end or provision for a system of primary election, that may be availed of at the option of such voluntary political associations or parties. The fact that the expense thereof is paid from public funds has not been found an obstacle to the reasonable regulation and the right exercise of party will, and the protection of its integrity and legitimate purpose. The line of demarcation being that no such voluntary party or association *is required* to operate under the primary law provided; and, as in our statute, it is not attempted to declare the *qualifications* of those who may

"participate," leaving this important domestic question or function to said association, or party operating thereunder, to prescribe its political belief and reasonable tests of allegiance thereto to elector and candidate alike within the provisions of the statute. Sections 612, 672, Code of 1923.

Adverting to general observations on primary laws, they are as follows (20 C. J. p. 111, § 109; p. 115, § 113; p. 116, § 116):

"In many jurisdictions primary elections are now expressly provided for and regulated by statutes and municipal charters. These provisions are of comparatively recent date, and the system provided for by them must still be considered in an experimental stage. The general tendency of these statutes is to put the rights of voters in party or primary elections under the protection of the law in the same manner that the rights of voters in elections of officers have been under its protection. They are modeled more or less along the lines of the general election laws of the states in which they are enacted, in so far as the conduct of the election is concerned, but they frequently differ from the general election laws in the tests and conditions which they impose on candidates and voters." Section 109, pp. 111, 112. * * *

"The primary election laws of the various states impose certain requirements on a candidate at a primary election, such as filing with a designated official, a certain number of days before the primary, a paper in some prescribed form announcing his candidacy, swearing that he is qualified, making a statement of his membership in, and support of, the party whose nomination he seeks, causing his name to be printed on the official ballot as a candidate for the nomination, and filing the names of persons selected as his campaign committee. Such requirements are mandatory, and compliance with them is essential to enable the candidate to be voted for at the primary election and to have his name printed on the official ballot at the general election as the nominee of one of the principal political parties." Section 113, p. 115. * * *

"A primary election has been held to be included in a constitutional provision prescribing the qualifications of voters at elections generally. As a rule, however, general constitutional and statutory provisions as to the qualifications of voters are not applicable to voters at primary elections. Some statutes specifically prescribe the qualifications of voters at primary elections.

"While every voter has the right to vote at the primaries of his party, a voter cannot participate in the primary of a party with which he does not affiliate, unless authorized to do so by statute. Primary election laws usually make provision for the enrollment or registration of the voters of the different political parties in order to prevent

persons not affiliated with a party from voting at its primaries. Such statutes, as well as other statutes restricting the right to vote at the primary election of a political party to persons affiliated with that party, and prescribing reasonable tests and conditions for ascertaining and declaring such affiliation, are valid. But some statutes have been held invalid as prescribing conditions impossible of performance, or as violating the constitutional guaranty of free and equal elections." Section 116, pp. 116, 117.

There is also an interesting discussion of the general subject in 9 R. C. L. p. 1072, § 86, pp. 1074-77, §§ 88 and 89, saying, among other things, of the effect of the trend of decisions as to importance of primary elections in the "modern election machinery," that the authorities "pointed out that the right to choose candidates for public office whose names shall appear on the official ballot is as valuable as the right to vote for them after they are chosen, and is of precisely the same nature, and so the statute which provides the methods by which that shall be done, and prescribes and limits the rights of voters and of parties, must be regarded as an integral part of the process of choosing public officers, and as an election law. On this principle it has been held that a primary election is an 'election' within the constitutional or statutory use of that term. Also, constitutional qualifications prescribed for voters at 'any election,' or at an election 'authorized by law,' have been held to determine the class of voters who may vote at primary elections. According to this view it is not competent for the legislature to enlarge the class of electors for that purpose nor to restrict it, and thus to place the first and very important steps of an election in the hands of others than constitutional electors."

Section 89, 9 R. C. L. pp. 1075, 1076, reads:

"The application of constitutional qualifications becomes a matter of peculiar interest in the case of statutory provisions confining the right of electors to vote to their own party primaries. Almost without exception primary laws provide some rule for testing the party character of the electors desiring to participate in the naming of party candidates and it has consistently been held that any reasonable test of party affiliation may be required by the legislature of those who desire to participate in the primary elections of the several parties. The purpose of such provisions is to prevent voters from raiding the primaries of a party to which they do not belong. In determining the validity of such tests no question can, of course, be raised under the broad rule laid down in some of the cases, that constitutional provisions as to electoral qualifications do not apply to primary elections. But it does not seem to be necessary to go to this extreme in order to support such a regulation, for it is not true that every citizen accorded the elective franchise under the constitution is entitled to vote at all elections. * * * The test of party affiliation has also been attacked on the ground that it violates the secrecy of the ballot, but, as has been pointed out, it is the secrecy of the ballot which the law protects and not secrecy as to the political party with which the voters intend to act. Affiliation with a party has always compelled a disclosure impliedly at least of the character of a person's vote. Moreover participation in the primary is voluntary. Various means of testing party affiliation are provided, the simplest being a denial of the right to vote at a party primary election unless the applicant 'voted with the political party holding such primary election at the last general election,' or unless he voted for a majority of the party candidates at the last election. * * * In some instances the oath requires not only a statement of affiliation with and belief in the principles of the party, but a declaration of intention to support the principles and candidates of the party in the coming election. In others a promise to support the party nominee is a prerequisite to admission to the primary."

The effect of the decisions as to regulation of the right to be a candidate at a primary election are thus stated (9 R. C. L. p. 1078, § 90):

"It is customarily provided that only those persons are entitled to have their names appear on the primary ballot as candidates for party nomination, who have first filed a petition to that end, at a time and in a form prescribed, and with the proper official. While this regulation prescribes an exclusive mode for nominating public officers, it is sustained on the ground that its subject matter is not an absolute right upon the exercise of which the legislature may not impose reasonable restrictions. In some jurisdictions, in addition to the requirement of affiliation on the part of the electors of a party a preliminary declaration of affiliation by the candidate is required. * * * Some courts, however, have sustained a requirement providing that when the nomination papers of a candidate are filed they shall be accompanied by an affidavit declaring the name of the candidate's party, that he affiliated with said party at the last preceding general election, and either that he did not vote or that he voted for a majority of the candidates of said party at said next preceding election, and intends so to vote at the ensuing election. This, it is held, does not violate a constitutional provision prescribing the form of oath to be taken by one before entering on the duties of his office, and providing that no other oath or declaration shall be required."

In Merriam and Overacker's Primary Elections the leading cases on due regulation are collected. And in Capen v. Foster, 12 Pick. (Mass.) 485, 489, 23 Am. Dec. 632, an early case on reasonable regulation of exercise of franchise, Mr. Justice Shaw said of the act requiring a "list of qualified voters" and prohibiting participation by those "whose names did not appear upon this list":

"* * * In all cases, where the constitution has conferred a political right or privilege, and where the constitution has not particularly designated the manner, in which that right is to be exercised, it is clearly within the just and constitutional limits of the legislative power, to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly and convenient manner. Such a construction would afford no warrant for such an exercise of legislative power, as, under the pretence and color of regulating, should subvert or injuriously restrain the right itself."

Then the case of Nominations to Public Offices, House Bill, 9 Colo. 631, 21 P. 474, extended the right of reasonable regulation "to machinery of political parties as such, on the authority of Leonard v. Commonwealth ex rel. Lewis C. Cassidy, Attorney General, 112 Pa. 607, 624, 4 A. 220," and in the last-cited case punishment for fraud and bribery in securing nominations was discussed. The Pennsylvania court (112 Pa. 607, 4 A. 220, 224) recognized the important relation of the primary as a part of "our great political system" so firmly established "as to be difficult of separation"; and where that Constitution (as in our Constitution) did not in express terms forbid the Legislature to regulate, the court said:

"The clause of the constitution referred to must receive a liberal construction. It is to be interpreted so as to carry out the great principles of government, not to defeat them. It is not to receive a technical construction, like a common-law instrument or statute. Com. v. Clark, 7 Watts & S. 127; Morrison v. Bachert, 17 Wkly. Notes Cas. 353. The object aimed at in the constitutional provision was the purification of our elections. * * * It recognizes the fact that many of the frauds which affect elections, and sometimes thwart the will of the people, are perpetrated in what may be termed the preliminary stages of an election,—in those proceedings by means of which candidates are selected for the people to vote for at the general election. We have already said that it is competent for the law-making power, by appropriate legislation, to repress and punish such frauds."

To like effect is Schiel v. Cook County, 137 Ill. 46, 27 N. E. 293, where the following observation is made:

"Whatever tends to corrupt elections in a free government, or detracts from the efficiency and honesty of the public service, must needs be a matter of grave public concern; and all methods which have for their object the prevention of those abuses, which every good citizen has observed with profound apprehension, by which incompetent and corrupt men have been chosen to offices of trust and power, should be commended and upheld * * * that liberal construction should be given to all laws having for their object the selection of candidates for the suffrage of the people by the uncorrupted and honest choice of the party, or association of voters selecting them, as well as to all other laws intended to conserve the purity of our elective system. But, however wise and beneficent this law may be considered, such considerations can furnish no excuse for the appropriation of the public funds by these mere political and governmental agencies to uses not authorized by law."

See, also, John H. Wigmore, "Ballot Reform: Its Constitutionality," Amer. Law Review, XXXIII; 10 Amer. & Eng. Ency. of Law, p. 586, collecting the early cases on constitutionality. A constitutional amendment was adopted in California after decisions of unconstitutionality, as to local or special law applying "to only two counties" —San Francisco and Los Angeles—in Marsh v. Hanly et al., 111 Cal. 368, 43 P. 975; in Spier v. Baker, 120 Cal. 370, 52 P. 659, 41 L. R. A. 196, on the ground that the title embraced many subjects.

In an early Mississippi case, McInnis v. Thames, 80 Miss. 617, 32 So. 286 (1902), the power of the state to regulate primaries was strenuously contested, on the grounds that the state was intervening in private affairs and interfering with the right of assemblage and agreement; that a particular individual was qualified "by education, habits, and brain force" to fill creditably a state office; the statute was upheld.

And in People v. Democratic Committee, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674, a majority of the court upheld the regulatory law against the Committee, since it was the intent of the statute that voters select.

The trial court of Louisiana proceeded on the ground that political parties were "largely beyond the domain of legislative interference" (Labauve v. Michel [civil district court]), and this ruling was reversed by the Supreme Court of that State in State v. Michel, 121 La. 374, 46 So. 430, 433, 434, 436, saying:

"* * * A voter has no more right to vote twice at the nomination than he has to vote twice at the election, that after he has voted once at either he has exhausted his right, and that by denying him another vote the Legislature does not deprive him of any right. Such a thing as venal voters is not

unknown. Voters of that stripe would find it profitable to be allowed to change their politics and vote at every successive primary, and to affix their names to an endless number of nomination papers; but the Constitutions of the state and the United States do not secure them that right, and do not take away from the Legislature the power to deny it them. The right of the Legislature to adopt a regulation by which voters not qualifying by party affiliation may be excluded from primaries has been often recognized. Kenneweg v. County Com'rs, 102 Md. 119, 62 A. 249; State v. Drexel [74 Neb. 776] 105 N. W. 174; Hopper v. Stack, 69 N. J. Law, 562, 56 A. 1. * * *

"So far as concerns the promise required of the voter, it is a sufficient answer to say that he is not deprived of any right, since he is left at perfect liberty to stay away, which, indeed, is the best thing for him to do, if he does not feel sufficiently confirmed in his political faith to be able to make with safety so reasonable and simple a promise. * * *

"It is of the very essence of a primary that none should have the right to participate in it but those who are in sympathy with the ideas of the political party by which it is being held. Otherwise the party holding the primary would be at the mercy of its enemies, who could participate for the sole purpose of its destruction, by capturing its machinery or foisting upon it obnoxious candidates or doctrines. It stands to reason that none but Democrats should have the right to participate in a Democratic primary, and none but Republicans in a Republican primary. A primary is nothing but a means of expressing party preference, and it would cease to be that if by the admission of outsiders its result might be the very reverse of the party preference. * * *

"The right of the Legislature to require that nominations shall be by primary and to prescribe additional qualifications to the voters for participating in same has been recognized by the Supreme Courts of several states and denied by the Supreme Court of only one state. Runge v. Anderson, 100 Wis. 523, 76 N. W. 482, 42 L. R. A. 239; State ex rel. McCarthy v. Moore, 87 Minn. 308, 92 N. W. 4, 59 L. R. A. 447, 94 Am. St. Rep. 702; State v. Drexel [74 Neb. 776], 105 N. W. 174; Hopper v. Stack, 69 N. J. Law, 562, 56 A. 1; Coffey v. Dem. Gen. Committee, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674. Contra, Spier v. Baker, 120 Cal. 370, 52 P. 659, 41 L. R. A. 196. In the above case of Coffey v. Dem. Gen. Committee, cited from the Court of Appeals of New York, Chief Judge Parker, who later became the candidate of the Democratic Party for the presidency, being the organ of the court, said:

" 'These and other abuses, as they were called by the minority members of party organizations, became so common that the demand was made for a primary election law sufficiently comprehensive in scope to assure to all citizens equal rights in primary elections, conventions, and political committees of the parties with which they were allied. This demand the Legislature undertook to meet by Laws 1898, p. 331, c. 179, which was amended by Laws 1899, p. 968, c. 473. These acts recognize the equal importance of primary and general elections, and modeled the conduct of the former upon the general lines of conduct of the latter. They provided for the enrollment of the voter, and the only exaction precedent to his right to vote is that he shall express an intention to support generally at the next general state or national election the nominee of such party for state or national officers.' "

In Ladd v. Holmes, County Clerk, 40 Or. 167, 66 P. 714, 722, 91 Am. St. Rep. 457, all "reasonable rules and regulations looking to the security and safeguarding of these sacred rights and privileges" were held to be within legislative authority to enact. We will again advert to this decision.

In the case of Hopper v. Stack, 69 N. J. Law, 562, 56 A. 1, 4, it was declared of such laws that the right of regulation was as that of an existing and recognized "state of facts" and the necessity of extending thereto "the protection of police regulation."

The right to expend the public moneys in the conduct of a primary, held not for a "public purpose," but for a "private purpose and consequently unconstitutional," was the effect of the decision in Waples v. Marrast, 108 Tex. 5, 184 S. W. 180, 182, L. R. A. 1917A, 253. See, also, Beene v. Waples, 108 Tex. 140, 187 S. W. 191, to the same effect. This result was not followed (as we have indicated) in Louisiana. State v. Michel, supra. Mr. Justice Provosty, writing for that court, as to this, declared that public moneys may be expended for such reasonable purpose—in holding primary elections—having for its end the necessity of making "more certain that the community shall elect the public officers whom it wants."

In Commonwealth v. John Rogers & others, 181 Mass. 184, 187, 63 N. E. 421, 423, Mr. Chief Justice Holmes said:

"It would be a strange inversion to say that no laws can be passed upon the mode of voting at a preliminary meeting held only for the purpose of getting names printed upon an official ballot when laws can be passed affecting the final vote. The Legislature has a right to attach reasonable conditions to that advantage, if it has a right to grant the advantage."

In State ex rel. Webber v. Felton et al., 77 Ohio St. 554, 84 N. E. 85, 12 Ann. Cas. 65, are quotations from "The American Common-

wealth" (Bryce), and the equal protection of the laws is discussed under Yick Wo v. Hopkins, Sheriff, 118 U. S. 356, 369, 6 S. Ct. 1064, 30 L. Ed. 220. See, also, McInnis v. Thames, 80 Miss. 617, 32 So. 286; Healey v. Wipf, 22 S. D. 343, 117 N. W. 521.

The foregoing will sufficiently illustrate the tendencies of the earlier decisions. These, and other decisions of the declared effect of regulation and classification of political parties, are collected by Merriam and Overacker in their recent work, under the chapter of "Judicial Interpretation," pp. 108–124.

The right of the Legislature to regulate the matter of test for party allegiance or affiliation, and that requiring the reasonable payment of fees, have been generally sustained where found to be reasonable. Socialist Party v. Uhl, 155 Cal. 776, 103 P. 181; Britton v. Board of Election Commissioners, 129 Cal. 337, 61 P. 1115, 51 L. R. A. 115; State v. Drexel, 74 Neb. 776, 105 N. W. 174; Ex parte Wilson, 7 Okl. Cr. 610, 125 P. 739, 746; Baer v. Gore, 79 W. Va. 50, 90 S. E. 530, L. R. A. 1917B, 723; Commonwealth v. Rogers, 181 Mass. 184, 63 N. E. 421; Hopper v. Stack, 69 N. J. Law, 562, 56 A. 1; Morrow v. Wipf, Sec'y of State, 22 S. D. 146, 115 N. W. 1121.

In Young v. Beckham, 115 Ky. 246, 72 S. W. 1092, 1094; Nixon v. Herndon et al., 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759; and Dapper v. Smith, 138 Mich. 104, 101 N. W. 60, statutes were held invalid on the grounds indicated—that "The legislature cannot impose any condition which will destroy or seriously impede the enjoyment of the elective franchise." Merriam & Overacker, pp. 128, 129.

The authorities as to the rights of candidates in the premises are likewise collected, and said to "present many interesting and perplexing questions." It is not necessary to this decision to follow them in detail. Primary Elections, Merriam & Overacker, pp. 129, et seq. Political parties not governmental agencies may establish arbitrary qualifications [Grigsby v. Harris (D. C.) 27 F. (2d) 942; Nixon v. Condon (D. C.) 34 F.(2d) 464]; not the state. Nixon v. Herndon, supra.

Adverting again to the general statutes and the legal phases on the subject, it may be stated that Mr. Cooley (2 Const. Lim. pp. 1358, et seq.) has collected authorities to the end of its importance and the necessity for its due and reasonable regulation by the state.

Viscount Bryce, in his "American Commonwealth," (2 vol. c. 60, pp. 55, 56 and 57) made pertinent observations on the subject, among which are:

"The usual test is, Did the claimant vote the party ticket at the last important election, generally the presidential election, or that for the State governorship? If he did not, he may be excluded. * * * In many primaries voters supposed to be disagreeably independent are kept out either by the votes of the existing members or by the application of these strict tests." * * *

"Every member of a nominating meeting, be it a primary or a convention of delegates, is deemed to be bound by the vote of the majority to support the candidate whom the majority select, whether or no an express pledge to that effect has been given. * * * Of course no compulsion is possible, but long usage and an idea of fair play have created a sentiment of honour (so-called) and party loyalty strong enough, with most people and in all but extreme cases, to secure for the party candidate the support of the whole party organization in the district. It is felt that the party must be kept together, and that he who has come into the nominating meeting hoping to carry his own candidate must abide by the decision of the majority. The vote of a majority has a sacredness in America not yet reached in Europe."

I have examined many of the statutes that have been sustained, and their several tests of party loyalty and allegiance were not arbitrary, inapt, or unreasonable, and did not deny the equal protection of the law. For example, the test prescribed in Wisconsin, Acts 1895, pp. 560, 567, was: Did the elector whose right is challenged vote the party ticket at the last important or general election? That of California, St. 1897, pp. 115, 124, was that the person challenged make oath that it was his "bona fide present intention" to support the nominee of such party or organization at the next ensuing election; and in New York, Sess. Laws, 1898, c. 179, pp. 331, 334, the requirement that the voter declare his "general sympathy with the principles of the (naming it) party"; is his intention to "support generally at the next general election, state or national, the nominees of such party for state or national offices," and has "not enrolled with, or participated in any primary election or convention of, any other party since the first day of last year." The statutes of Florida define political parties, provide for registration of change of party affiliation, executive committees had the usual powers exercised by such consistent with the law, and that the elector did not vote for the nominee of any other party in the last general election. Comp. Gen. Laws 1927, §§ 356, 361, 365. In Massachusetts there is provision for nomination papers that shall declare political party whose nomination is sought. Gen. Laws of Mass. p. 443, c. 53, § 45; and in Indiana Statutes (Burns' Ann. St.) 1914, § 7079, requiring the statement that elector voted for majority of the regular nominees of such party at the preceding election. In Illinois, where there is challenge of votes, the elector must swear he had not voted at the primary of another party within the last two years, and not then affiliated. Callaghan's Ill. Laws, 1920, p. 885, § 5158. The laws of Idaho require a

statement of membership and not affiliated with another party, and not becoming a candidate of another party. Idaho Comp. St. 1919, § 543. In the Oregon Laws 1901, pp. 317, 323, is the provision that, when challenged, the proposed elector should qualify by swearing he voted at the last general election for a majority of candidates of such party or association, and that he intends adherence at the next general election. The test in the Oregon Laws, 1901, pp. 317, 323, was that, if challenged, he should swear or affirm that he "voted for a majority of the candidates of such party or association at the last [general] election, or intends to do so at the next [general] election."

The foregoing will suffice as reasonable statutory tests of loyalty and affiliation as to voters; and will illustrate that, in the enactments of the Legislature and construction of primary laws, much must be left to the Legislature to determine; and that so long as it can be said that the test of loyalty and affiliation by law is (1) apt, and (2) reasonable, it has been permitted to stand (Ladd v. Holmes, 40 Or. 167, 66 P. 714, 91 Am. St. Rep. 475) as prescribed by statute.

The examination of the acts that have been stricken and the provisions thereof are held to have been inapt, unreasonable, arbitrary, or as not according the equal protection of the law. Young v. Beckham, 115 Ky. 246, 72 S. W. 1092, 1094, as unduly limiting the right of an elector in the selection of a candidate; Nixon v. Herndon, supra, turned upon the question as held of equal protection of the law; Dapper v. Smith, 138 Mich. 104, 101 N. W. 60, denying the right to vote for one who does not become a candidate. See State v. Dillon, 32 Fla. 545, 560, 570, 14 So. 383, 22 L. R. A. 124; Sanner v. Patton, 155 Ill. 553, 40 N. E. 290, as to the right to exercise the elector's choice to vote for any person who is qualified; Bowers v. Smith, 111 Mo. 45, 20 S. W. 101, 16 L. R. A. 754, 33 Am. St. Rep. 491; Eaton v. Brown, 96 Cal. 371, 31 P. 250, 17 L. R. A. 697, 31 Am. St. Rep. 225, and authorities in notes.

From the general authorities and the laws of this jurisdiction, the exercise of the franchise is an important political privilege for which the Legislature must provide and *may reasonably regulate.* That is, the electors and candidates participating in party primaries are subject to reasonable party laws, under the statutes not inconsistent with the several Constitutions, state and federal; that there is a dual relation of the two classes, electors and candidates, that is inherent in the subject-matter and the due exercise of respective rights in relation thereto in the participation in such election. In this state it is held that the exercise of the elective franchise is a privilege and not a personal or property right subject to reasonable qualifications under the law; and there may be a proper exclusion of persons and classes of persons in such wise as that the federal Constitution is not violated (Gardina v. Jefferson County Board of Registrars, 160 Ala. 155, 48 So. 788. See, also, Garrett v. Cuninghame, 211 Ala. 436, 100 So. 845), and by political parties not governmental agencies.

It is on this assumption or principle that the states have enacted, and there have been sustained, reasonable regulations governing the holding of elections—general and primary elections—as regulations as to time, place, form, and preparation of the ballot, distribution of same to electors, and its preparation and deposit in the ballot box, the specification of districts, precincts, or residence of electors, the reasonable prescriptions for tests of allegiance, affiliation, or adherence to the duly declared result of such expressed will. State v. King County, 60 Wash. 370, 111 P. 233, 140 Am. St. Rep. 925.

The act of participation in primary elections held in substantial compliance with the statute, and by the duly constituted authorities of the political party in question, presupposes that degree of good faith required, and that under the general provisions of the statute the participating electors are qualified, and that the candidates be of the same belief or party affiliation. And opportunity for participation and candidacy within the party should be a full, free, and due opportunity given for the exercise of the choice. Such are the presumptions and binding effect inherent in the act of casting the ballot. Garrett v. Cuninghame, supra.

The importance of the primary system as a step in getting the name of a candidate upon the official ballot, the freedom of choice of candidates from those of the association or organization who may become candidates, are of equal importance with the freedom of the expression of the choice between candidates at general election, is the effect of Ladd v. Holmes, 40 Or. 167, 66 P. 714, 719, 91 Am. St. Rep. 457, 468, 471 and 472. It is said:

"* * * Where party primary elections are held, such as are authorized and required by law, and under the supervision and inspection of public functionaries; it is not a violation of the constitution that all electors are not permitted to vote at a particular party election. Electors of one party have no desire, unless prompted by sinister or evil motives, nor have they any inherent right, within or without the constitution, to vote at some other party primary or election; hence no right or privilege of which they can complain has been intrenched upon or violated. We see no objection to the legislature providing for party elections, and limiting the electoral privilege to party members. The exclusion of other party members from participating in such elections is not an infringe-

ment or denial of a constitutional right or privilege. * * *

"As party struggles became more intense a closer and more comprehensive organization was established, which satisfied the claims of the party leaders, concentrated the efforts of individuals, and knit them together for a common purpose, while it expressed absolute equality of all voters, and the right of each to participate in the selection of candidates and the adoption of party platforms. This new party régime grew and ripened, as it respects the Democratic party, about the year 1835, and, as to the Whigs, some years later; and, when the Republican party sprang up, it adopted the system in all of its essential features. The true theory of popular sovereignty requires that the ruling majority must name its own standard bearers or candidates, must define its policy, and in every way express its own mind and will; and the system thus developed and matured is in accord with that theory. It is strictly representative throughout; is not a mere contrivance of party intrigue, or for preventing dissensions, but an essential feature of matured democracy. 2 Bryce Am. Com. c. 59 (entitled 'Party Organizations') p. 44. * * * The primary is the initial step in the system looking to the nomination of candidates whose names are to find a place upon the official ballot, and through its agencies to be submitted to the qualified electors for an expression of their choice. At the top the constitution expressly declares there shall be a free and untrammeled ballot, but its spirit pervades the whole, and reaches back to the inception of the choice of a candidate; so that every elector must be as free to express his own choice of a candidate as to denote his choice of a public officer at the polls. If it were not so, of what avail would be the ballot in the hands of the people?"

Adverting to Viscount Bryce, he declares that party management and its agencies employed for the securing and promoting of their selection are details which have more "significance and make more difference to the working of the government than many of the provisions of the Constitution itself." 2 Bryce's American Commonwealth, page 57.

In Merriam and Overacker's Primary Elections, pp. 55, 72, 73, it is stated:

"In the six states of Alabama, Arkansas, Delaware, Georgia, Kentucky, and Virginia, the parties are free to use either the direct primary or the convention method, although in the case of Kentucky this option exists only for state officers and United States senators, the direct primary being mandatory in other cases. In all of these states if nominations are not made at direct primaries, the party authorities are left practically free to regulate the election of delegates and the nominating convention as they see fit." * * *

"There are eleven states in which the de-termination of a person's right to participate in a party primary is left to the party, with or without a statement of minimum requirements in the law itself." * * *

"In Alabama, 1903, p. 356; Arkansas, 1917, p. 2287; Georgia, 1917, p. 183; Idaho, 1919, p. 372; South Carolina, 1915, p. 163; and Texas, 1907, p. 328, the party is free to impose and enforce the qualifications it sees fit."

The act of Texas, 1923, was declared unconstitutional on account of the test employed, holding that the equal protection of the laws was denied plaintiff as prohibited by the 14th Amendment. Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759. It will not be necessary to examine the tests of other states, other than to observe that much has been left to a reasonable legislative discretion in prescribing regulations.

The statutes that have been examined illustrate that in the enactment, and, as for that, the construction of these laws (and such is the practical necessity or fact), that much *must be left to the legislature to determine;* that, so long as it can be said of the statutes that they employ and adopt tests of affiliation and loyalty that are apt and reasonable, they have been upheld. Ladd v. Holmes, 40 Or. 167, 66 P. 714, 91 Am. St. Rep. 475.

And it is believed to be certain that, if the tests employed are reasonable and apt in the primary election statutes, and construed to like end, then the voluntary association and party are free to act within the statutes; such acts and statutes will not be found to offend the provisions of the 14th or 15th Amendments of the Constitution of the United States (Ann. Const. Am. Law Book Co. Ed. p. 240, and notes), and under the settled constructions of the Supreme Court of the United States.

Merriam and Overacker's Primary Elections reviews the judicial interpretation of primary laws (pp. 108–140), and concludes with the observation that:

"On the whole, the courts have sustained the constitutionality of primary legislation of the last forty years with few exceptions. In California and in Illinois considerable difficulty has been experienced in securing the passage of a law that would meet the approval of the courts, but elsewhere the judicial veto has been very sparingly exercised. In no field of legislation has the judiciary shown itself more friendly to experiment than in the regulation of political organizations." * * * "No particular property rights have been involved, the pressure of public opinion has been strong and steady, the judges have been conversant with the facts and the philosophy of the party system, and hence have experienced little difficulty in justifying almost every kind of a primary system that has been adopted by a legislative body."

What, then, are the pertinent provisions of the Constitution and statutes of this state on

the subject? It will be observed that by section 177 et seq., of our Constitution, and the Nineteenth Amendment to the Constitution of the United States (Graves v. Eubanks, 205 Ala. 174, 87 So. 587), there is guaranteed to qualified electors the right to vote at any election by the people, under the reasonable terms and regulations prescribed by law. § 177 et seq., Constitution of Alabama 1901; Gardina v. Jefferson County Board, etc., 160 Ala. 155, 48 So. 788. And it is provided by § 183 Constitution, that "No person shall be qualified to vote, or participate in any primary election, (a) party convention, mass meeting, or other method of party action of any political party or faction, who shall not possess the qualifications prescribed in this article for an elector, or who shall be disqualified from voting under the provisions of this article."

This subjected the right to vote or participate in a primary election to the requirements of the Constitution, and to the reasonable requirements prescribed by the Legislature for electors and candidates. Const. 1901, § 177, et seq.; § 601, et seq., Code.

Thus we are brought to the provisions of § 604, Code, as to primary elections, "except as herein modified shall be held and conducted in the same manner and form and under the same requirements and subject to the same forfeitures and penalties and punishments as are or shall be provided by law for the holding of regular state elections, *but nothing * * * shall make it obligatory upon any political party or parties to hold a primary election.*" Such were the provisions that were made in our first act to regulate primary elections. 1903, p. 356.

And section 179 Constitution 1901 requires that all elections by the people shall be by ballot; and it is required by § 190 of the Constitution that the Legislature shall pass consistent laws "to regulate and govern elections," and for "the regulation of primary elections, (a) and *for punishing frauds at the same,* but shall not make primary elections compulsory." Hooper v. State ex rel. Fox, 206 Ala. 371, 373, 89 So. 593. And in response to this mandate our primary election laws were enacted. General Acts 1903, p. 356; Acts 1915, p. 218; Acts 1919, p. 969; Incorporated in Code of 1923 as § 601, et seq.; Acts 1927, pp. 89, 409.

I have indicated the requirements of § 604 of the Code; those of § 612 are:

"All persons who are qualified electors under the general election laws of this state shall have the right to participate in such primary elections, *subject to such political or other qualifications as may be prescribed by the state executive committee or governing body of such political party for its candidates.* The state executive committee may delegate to the several county executive committees the power to prescribe the qualifications of voters in any primary election for the nomination of candidates for offices to be filled by the vote of a single county." (Italics supplied.)

It is interesting to note that the qualifications of voters were thus phrased in Gen. Acts of 1903, p. 358, § 10:

"That all persons who are qualified electors under the general election laws of this State shall have the right to participate in such primary elections, subject to such *political qualifications* as may be prescribed by the State Executive or Central Committee or governing body of such political party. The State Executive Committee may delegate to the several County Executive Committees the power to prescribe the qualification of voters in any primary election for the nomination of county officers." (Italics supplied.)

And in § 608, Code, the committees of political parties are said to be vested with "all the powers that could be exercised by any such committee"; section 609, expenses to be paid in as provided by law for general elections held under the law; section 620, power of officers of all primaries the same as in regular elections; section 624, qualified electors "a member of a political party" shall be "entitled to vote" and "receive the official primary election ballot" of his political party, "and no other."

And in section 669, Code, executive committees may prescribe rules governing "contests and other matters of party procedure as it may deem necessary, not in conflict with the provisions of this chapter." Chapter 20, Code of 1923; Acts 1915, pp. 218, 237, § 55.

It was first provided in General Acts of 1915, p. 220, § 11, [1] that "*All persons who are qualified electors* under the general election laws of the State [2] shall have the right *to participate* in such primary elections, [3] subject to such *political or other qualifications* as may be prescribed by the State executive committee or *governing body of such political party";* and [4] "The State executive committee may delegate to the several county executive committees the power to prescribe the qualifications of voters in any primary election for the nomination of county officers." (Italics supplied, also numbers.) The amendment in Acts of 1919, p. 969, § 11, was of like import, with the significant qualification or addition (3) of the words *"for its candidates,"* which made it read: "Subject to such political or other qualifications as may be prescribed by the State executive committee or governing body of such political party *for its candidates.*" (Italics supplied.)

In section 58, Acts of 1915, p. 238, the provision was that the act was not intended to prohibit any executive committee of a party from fixing assessments or other qualifications, as it may deem necessary, for any person desiring to become a candidate for any office in any such primary election. This was carried into the Acts of 1919, p. 979, § 58, and codified as section 672, Code of 1923, reading, "Any executive commit-

tee of a party may fix assessments or other qualifications as it may deem necessary, for persons desiring to become candidates for nomination to office at a primary election," and fixing the fees to be exacted of candidates. And sections 604, 605, Code, make the primary law exclusive—no other party primary may be held—"shall not be obligatory upon any political party" to hold a primary election. Acts 1915, p. 218, § 4.

Certain corollaries may be deduced from the statutes and decisions as: (1) That primary elections held in this state at public expense must be called and held in substantial compliance with organic and statutory law. (2) That executive committees of political parties have the right to declare political or other qualifications and tests of loyalty and affiliation for electors and candidates alike, and not different or double qualifications. The matter of qualifications being left by the Constitution of Alabama to the Legislature, it prescribed or limited by sections 612, 672 of the Code. (3) The *method of proof* of such party affiliations and loyalty may be different as to elector and candidate (not different in degree), on account of the impracticability of otherwise attesting or affirming the same. The elector may do this by his participation (when not challenged at the polls, and then by prescribed oath); the candidate must do this by his sworn declarations as prescribed to be filed with the secretary of state and chairman of the Executive Committee. This is not a requirement of a dual or different test of allegiance or affiliation— merely that of the manner of affirming or declaring the same fact of party affiliation and loyalty. (4) It is the legislative intent that, as to affiliation and party loyalty, all electors may become candidates, and all candidates may be electors. (5) That it is the purpose and reasonable interpretation of sections 612, 672, of the Code, as a part of that important system, when construed together, not to authorize a test or qualification by the committee that was inapt, unreasonable, and arbitrary to party loyalty and affiliation as to a candidate that is not likewise applied to an elector, or vice versa. (6) The Constitution leaves the matter of domestic regulation and control to the Legislature with the power of reasonable regulation, and the Legislature left it to the governing body of the party, after expressly declaring that electors and candidates be subject to and may participate in the primary under the same and like political or other qualifications. (7) The only interpretation of sections 612, 672, Code, that is reasonable is that contained in its plain and simple language—that the same tests of party loyalty and affiliation be prescribed for party electors as for party candidates. This uniformity the resolution in question failed to provide as it should have done. (8) The Legislature required this dis-charge of duty of the party's committee; if it decides, and is to hold a party primary at public expense. (9) The law exacts of this court the construction of the law as duly enacted, and I conceive it my duty to do so as to these statutes and the resolution in question.

That statute is plain and unambiguous; it is its own interpreter, and expresses the legislative intent. Wilkerson v. Lane, 181 Ala. 646, 62 So. 31. The intent and expressed purpose of the Legislature are found in the use of the words "for its candidates" after the words "political party." This was the requirement for the one standard of party loyalty and affiliation for all *who participated* in the *primary as electors and as candidates.* In this requirement the due right to vote and participate in such primary election of a political party is not denied on grounds made the subject of the Fourteenth and Fifteenth Amendments to the federal Constitution.

(1) The statute, as required to be applied in section 612, Code, to electors and candidates alike, was applied by the resolution to the election of candidates for federal, state, district, circuit offices, and state executive committees, and officers to be elected by the vote of a single county for a *uniform and single test* of party affiliation and loyalty *for all electors.* (2) A different test of party affiliation and loyalty is prescribed and required of *candidates* who stand for election to office for federal, state, district, circuit, or state committeemen; *different from that prescribed for all electors in party primary;* (3) and different test from that permitted (with limitations) of exaction by county executive committee or *candidates* for county offices to be filled by the "votes of a single county."

It follows from this material departure in the resolution from the requirements of law that the primary election called is not the kind of primary that may be held under the law and at public expense in the state of Alabama. The right of payment therefor from public funds is a matter of public concern that may be duly challenged by the taxpayers' bill on the ground of failure in material respects to comply with the statute in the primary called.

A decision of the main question presented by the bill is invoked by counsel. It has to do with a property right; or rather that of the right of expenditure of the public moneys. It is not in a case of the contest of elections as is forbidden of equitable cognizance. The specification by statute of the one instance of denial of jurisdiction to a court of chancery or its judges, in a case of contested election, indicates the legislative will in this state as to the general texts that are cited. And I am of opinion that, in this jurisdiction, the limitation as to elections is as stated in section 549, Code of 1923.

268

The case of Wright v. Cook, 216 Ala. 270, 113 So. 252, is where jurisdiction was sustained, and the rights of adverse claimants as members of the board of education were adjudicated. That of Dennis v. Prather, 212 Ala. 449, 103 So. 59, held that equity will restrain an election wholly unlawful as to the removal of a courthouse; and it is declared that "equity will *restrain election wholly unauthorized by law* in absence of legal remedy"; that "statutes restricting jurisdiction of equity courts should be strictly construed"; that "Code 1923, § 549, relating to equity jurisdiction in election contest cases, does not preclude court of equity from enjoining election *wholly unauthorized by law.*" Such is the status of the proposed primary, varying in material respects to the requirements of statute section 612, Code, for a paid party primary.

In Petree v. McMurray, 210 Ala. 639, 98 So. 782, this court sustained an injunction "restraining election commissioners from holding an election for county superintendent of education, upon the ground that the act providing for the election was unconstitutional," etc.

In Coleman v. Town of Eutaw, 157 Ala. 327, 47 So. 703, it is declared that courts of equity are forbidden of jurisdiction of "election contests." Yet, many enjoined the issue of bonds authorized by election and the attempt to create an illegal debt against the municipality.

The case of Jones v. Black, 48 Ala. 540, was a bill to test the constitutionality of an act; denied on the allegations that the act under which election for judge was proposed to be held unconstitutional. It was filed "by individual electors in their own names, they not showing any injury or damage to themselves in person, property or rights."

I am of opinion that complainant-taxpayer's bill to prevent illegal expenditure of public funds, etc., was well stated and grounded, and not within the inhibitions of the law. And believing that the trial court committed reversible error, and that it is my duty to express my opinion upon the merits as presented, I therefore respectfully dissent.