(114 So. 472)

**FAIRCLOUGH v. ST. AMAND.** (6 Div. 808.)

Supreme Court of Alabama. Nov. 3, 1927.

**1. Equity ⊜104—Equity will look behind nominal complainant in determining who real parties are and as affecting and enforcing estoppel against either party.**

A court of equity will look behind the nominal complainant to ascertain truth of matter in determination of who real parties in interest are and as affecting and enforcing estoppel against either of parties, if facts warrant.

**2. Divorce ⊜165(2)—One procuring divorce decree by fraudulent conduct is estopped to question its validity.**

One who procures divorce decree through his or her fraudulent conduct is bound thereby and estopped to question its validity.

**3. Divorce ⊜165(2)—One in privity with person who fraudulently procures divorce decree is estopped to question its validity.**

One in privity with a person who by fraudulent conduct procures a divorce decree is estopped to question its validity.

**4. Divorce ⊜165(2)—Fraud of second husband in procuring divorce for wife from first husband held not to authorize setting decree aside in first husband's suit (Code 1907, § 5199).**

Where wife's second husband was instigator of her suit for divorce from her first husband in Alabama and after decree remarried her, and child born to them was, under Code 1907, § 5199, rendered legitimate, fraud in procuring the decree by perjured testimony as to wife's residence in Alabama *held* insufficient grounds for setting decree aside at instance of first hus-

band, where evidence showed that second husband was real party.

**5. Divorce ⚫165(4)—Delay of more than year before challenging divorce decree held laches, preventing setting aside of decree (Code 1907, § 5199).**

Where second husband was instigator of divorce procedure by wife against her first husband, and under fraudulent testimony as to her residence in Alabama decree was procured, and second husband thereafter remarried wife, and, under Code 1907, § 5199, child born to them was made legitimate, delay of first husband of more than a year in filing bill of review to set decree aside *held* laches barring right thereto, especially in view of renewed friendship or business relations between first and second husbands and changed relations of wife and birth of the child.

Appeal from Circuit Court, Jefferson County; William M. Walker, Judge.

Bill in the nature of a bill of review by Frederick St. Amand against Dorothy Woodward Fairclough, to set aside a decree of divorce rendered in a cause styled "Dorothy E. St. Almond against Frederick St. Almond." From a decree for complainant, respondent appeals. Reversed and rendered.

James H: Willis and McClellan, Rice & Stone, all of Birmingham, for appellant.

One who procures a divorce through his fraud is thereafter estopped to question the validity thereof, and such decree cannot be set aside at the instance of one who participated in the fraud. Kaufman v. Kaufman, 177 App. Div. 162, 163 N. Y. S. 566; Id. (Sup. Ct.) 160 N. Y. S. 19; 34 C. J. 362; Nichols v. Nichols, 25 N. J. Eq. 60; Dow v. Blake, 148 Ill. 76, 35 N. E. 761, 39 Am. St. Rep. 156; Van Slyke v. Van Slyke, 186 Mich. 324, 152 N. W. 921; Simons v. Simons, 47 Mich. 253, 645, 10 N. W. 360; Bancroft v. Bancroft, 178 Cal. 359, 173 P. 579, L. R. A. 1918F, 1029; Moor v. Moor (Tex. Civ. App.) 63 S. W. 347. The court will look behind the nominal complainant in a bill in equity to ascertain the real complainant, and enforce an estoppel against such real complainant. Nicrosi v. Calera Land Co., 115 Ala. 429, 22 So. 147. Complainant is barred by laches. Nichols v. Nichols, supra; Karren v. Karren, 25 Utah, 87, 69 P. 465, 60 L. R. A. 294, 95 Am. St. Rep. 815; Barnette v. Miller, 131 Ark. 110, 198 S. W. 873; Maher v. Title, 95 Ill. App. 365; Nicholson v. Nicholson, 113 Ind. 131, 15 N. E. 223.

Frank Bainbridge, of Birmingham, for appellee.

Brief did not reach the Reporter.

THOMAS, J. [1] A court of equity will look behind the nominal complainant to ascertain the truth of the matter in the determination of who the real parties in interest are, and as affecting and enforcing an estoppel against either of said parties, if the facts warrant. Nicrosi v. Calera Land Co., 115 Ala. 429, 22 So. 147; Whiteman v. Taber, 205 Ala. 319, 87 So. 353.

[2] The general principles of an estoppel have been stated by the courts and need not be repeated. Ivy v. Hood, 202 Ala. 121, 79 So. 587. It is rested on reason, and to the effect, that one who procures a decree (of divorce) through his or her fraudulent conduct is bound by it and is thereby estopped to question its validity. This is the rule of the English (Duchess of Kingston's Case, 20 Howell, St. Tr. 355) and that of the American courts. Kaufman v. Kaufman, 177 App. Div. 162, 163 N. Y. S. 566; Nichols v. Nichols, 25 N. J. Eq. 60; Dow v. Blake, 148 Ill. 76, 35 N. E. 761, 764, 39 Am. St. Rep. 156; Van Slyke v. Van Slyke, 186 Mich. 324, 152 N. W. 921; Simons v. Simons, 47 Mich. 253, 645, 10 N. W. 360; Bancroft v. Bancroft, 178 Cal. 359, 173 P. 579; Moor v. Moor (Tex. Civ. App.) 63 S. W. 347.

In Karren v. Karren, 25 Utah, 87, 93, 69 P. 465, 466 (60 L. R. A. 294, 95 Am. St. Rep. 815), is contained a statement of the general rules, as follows:

" 'After a decree of divorce is rendered other marriages may be contracted and children born, and it is against public policy to vacate the decree, as such an order would render innocent parties guilty of bigamy, and their children illegitimate. Accordingly, the courts have sometimes refused to vacate decrees of divorce.' 7 Enc. Pl. & Prac. p. 138. But when the vacation of a decree of divorce, obtained by collusion, is sought by a willing participant in the fraud, the court, on the principle of the maxim, 'Ex dolo malo non oritur actio,' will refuse to disturb the decree, especially when the opposing party has remarried, and children have sprung from the second union. 2 Nels. Div. & Sep. § 1055; 2 Bish. Mar. & Div. § 1548; Hubbard v. Hubbard, 19 Colo. 13, 34 P. 170; Simons v. Simons, 47 Mich. 253, 645, 10 N. W. 360; Orth v. Orth, 69 Mich. 158, 37 N. W. 67; Yorston v. Yorston, 32 N. J. Eq. 495; Nichols v. Nichols, 25 N. J. Eq. 60; Greene v. Greene, 2 Gray [Mass.] 361, 61 Am. Dec. 454. In the latter case Shaw, C. J., said: 'In using the term "collusion" in the present case, we presume the libelant does not mean to use it in its ordinary sense, as collusion between the parties to the former proceeding (on divorce), and so a fraud upon the law, because that would include herself as party to the fraud.' * * *

"It would be a special novelty for a plaintiff to address the tribunal with, 'The defendant and I have been playing a trick on this court, but I discover he has got the better of me, so please turn the tables on him.' Also, in Broom, Leg. Max. 711, thus: 'No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.' "

And in Supreme Lodge v. Eckhardt, 197 Ill. App. 302, it is declared:

---

⚫For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"The jurisdiction of a court of a suit for divorce cannot be questioned in a subsequent proceeding by the party at whose request and upon whose testimony as to jurisdiction of facts such court found that it had jurisdiction, especially where such party has received the benefits of the divorce litigation and rights of others have accrued thereunder, it being immaterial whether the adjudication in the divorce litigation was procured through misrepresentation of facts or misrepresentation of the law."

[3] Such is the rule as to parties to an action, and a person in privity with them who caused the same is likewise bound. 2 Freeman on Judgments, § 336. That is, estoppel and laches have been held to bind a personal representative of the party so affected. Patterson v. Weaver (Ala. Sup.) 114 So. 301;[1] Snodgrass v. Snodgrass, 176 Ala. 276, 57 So. 474. And such is the estoppel as to invoking the question of the jurisdiction of the court, where the action challenged was invoked or procured by fraud of a party in interest. Nichols v. Nichols, supra; Supreme Lodge v. Eckhardt, supra; Moor v. Moor, supra; Carlisle v. Carlisle, 96 Mich. 128, 55 N. W. 673.

[4] A careful reading of this record convinces us that Fairclough actuated, dominated, participated, and procured the decree that by this suit is challenged as constituting a fraud as to the residence that vitiated the decree of divorce in the suit of St. Amand or St. Almond. The validity vel non of that decree affects other procedures in another state, on which the rights of Dorothy and her child Kingston (by Fairclough) are rested, by virtue of the second marriage in another state contracted by Dorothy and Mr. Fairclough, Jr., after that decree for divorce was rendered in Alabama. Not only did said Fairclough come to Alabama for the purpose of that proceeding, after assuring Dorothy that her marriage or temporary status with St. Almond was a nullity, but he caused the jurisdiction of the Alabama court to be invoked to the end of the rendition of the decree, and with a full knowledge of all the facts, thereafter, he remarried Dorothy in New York, and she bore him a child whose paternity he has consistently recognized, treating and regarding the mother as his wife and the child as his son. This action on his part was predicated on his guilty conduct in the premises, with full knowledge of facts and the legal effect or status superinduced, and in acquiescence of his guilty conduct advised, arranged, procured, financed, and was a beneficiary of the Alabama decree for divorce. When the Faircloughs came to Alabama, divorce was his object that he might remarry Dorothy. He had repeatedly assured her that her temporary association with St. Almond, by reason of her immaturity, or nonconsent, or whatever be the reason, was invalid under the law of New York or New Jersey. She was a passive agent or actor under his domination and control, subject to his wish, suggestion, or domination. His was the guilty knowledge of all the facts and the law in the premises and participated and directed to the end of the fraud he now seeks to uncover under other name and agency. He left his home on the 9th or 10th of January, 1923, for Birmingham, bringing Dorothy, after he had been advised by his friends or members of his family not to do so; his object was divorce against St. Almond.

Such was not Dorothy's intention or aim—it was subservience to his will and purpose of the husband she loved and trusted, by reason of their former marriage. She said in reply to the question:

"Now, Mrs. Fairclough, when you went down to Alabama, did you and Mr. Fairclough go down with the intention that you should sue for a divorce down there? A. Mr. Fairclough, Jr., had some scheme in his head, but what, I don't know.

"Q. Did Mr. Fairclough, Jr., of course, know about your marriage to Mr. St. Almond? A. Yes, sir.

"Q. And did he know the circumstances under which that marriage had taken place? A. Yes, sir.

"Q. Did Mr. Fairclough, Jr., say anything to you as to whether or not your marriage to St. Almond was a good marriage or not? A. Yes, sir."

Her position is further defined as follows:

"Q. Did Mr. Fairclough, Jr., make any statement to you as to whether or not your marriage to St. Almond was a good marriage? A. Yes, sir.

"Q. What did he say on that subject, and anything else? A. He said my marriage was invalid.

"Q. And did he say whether he knew anything about law himself? A. Yes.

"Q. What did he say on that subject? A. What subject?

"Q. As to whether or not he knew any law? A. He said he knew the law on marriage and divorce.

"Q. And did he tell you whether or not this divorce, that would be obtained in Alabama, would be a good divorce? A. Yes, sir.

"Q. Did you believe what Mr. Fairclough, Jr., told you? A. I did.

"Q. When he told you that your marriage to St. Almond was not good, did you marry him after that? A. Yes, sir.

"Q. Where? A. Harriman, N. Y.

"Q. And when you married him in Harriman, N. Y., did you or not believe what he said about your marriage to St. Almond being no good? A. I did.

"Q. Why did you go down with him to Birmingham, Ala.? A. Because I thought my second marriage was legal.

"Q. And did you go down there then and live

[1] 216 Ala. 686.

in good faith with Mr. Fairclough, Jr.? A. I did.

"Q. Did you personally intend to work any fraud on St. Almond, or the circuit court of Jefferson county, Ala.? A. No; I did not.

"Q. Did Mr. Fairclough, Jr., at any time, tell you that you were working a fraud on Mr. St. Almond? A. Absolutely not.

"Q. Or that you were working a fraud on the circuit court of Jefferson county, Ala.? A. No."

And she then stated that she lived with him in Birmingham as husband and wife, confided, trusted, and loved him as her husband, and from that relation she bore him the son they called Kingston, whom he recognizes and admits as his child. She was asked and answered:

"Q. In your proceedings in Alabama—I withdraw that. Whose suggestion was it that you should sue Mr. St. Almond, in Alabama, for a divorce? A. Mr. Fairclough, Jr.'s.

"Q. Did Mr. Fairclough, Jr., say that you could obtain a divorce from Mr. St. Almond, in the state of Alabama, on a 6 months' residence? A. He did.

"Q. What did he say? A. He said it would be as good as gold.

"Q. Now, do you remember, Mrs. Fairclough, of Mr. Fairclough, Jr., after his marriage to you, entering into a marriage with a Beulah Grebbs, at Reegelsville, in the state of Pennsylvania? A. I do.

"Q. Between the time of your marriage to Mr. Fairclough, Jr., and his marriage to Miss Grebbs, did Mr. Fairclough ever get any divorce from you? A. No, sir.

"Q. Or any decree or order of annulment? A. No, sir; he did not.

"Q. And up to that time—I withdraw that. From the time of Mr. Fairclough, Jr.'s—I withdraw that. After this marriage that Mr. Fairclough, Jr., contracted with you, at Harriman, N. Y., did he ever marry you again? A. Yes, sir.

"Q. Where? A. In New York City, on the 12th day of December, 1923.

"Q. And when did you and he separate, as near as you can say? A. April 8, 1924.

"Q. And how had Napoleon Bonaparte Fairclough, your husband, been treating you up to that time, and before? A. Cruelly."

From this and the other evidence, his was the guilty knowledge acting to his selfish and guilty ends; she was not so actuated. He was assuring her of the invalidity of the marriage and temporary relation with St. Almond and that the proceeding in Alabama so declared. His subsequent marriage to Dorothy after the divorce in Alabama and his recognition of the child by her are additional reasons or grounds for the estoppel against him as the real, active, guilty party in interest here. Ruger v. Heckel, 85 N. Y. 483.

At the risk of repetition, we may say that the record shows the interest of Fairclough in a decree of annulment, activities in arranging for this attack on the decree, furnishing counsel to take the depositions in the cause, and activity as to bringing or procuring witnesses testifying against the effort of Dorothy to maintain her second marriage and legal paternity of her child, the financial condition and ability of Fairclough to prosecute the bill of review, the lack of financial ability on the part of St. Almond, and the absence of immediate benefit to St. Almond in setting aside the decree, his association with the Faircloughs, admissions of their pay and his efforts to procure money from Dorothy, convinces us that Fairclough, and not St. Almond, is the real actor and party in interest here; that he is bound by the principle of estoppel to which we have adverted.

[5] In New Jersey, the state of St. Almond's residence, it has been declared that when a child has been born to one of the parties to a divorce by a marriage succeeding such divorce, the decree of divorce will not be set aside at the instance of one who by his laches has acquiesced in such decree. Nichols v. Nichols, 25 N. J. Eq. 60. The same rule was announced in New York on the mere remarriage of a party. Singer v. Singer, 41 Barb. (N. Y.) 139. Under the circumstances before us, a delay of more than a year after the decree, before challenging it, is sufficient to present the bar of laches when St. Almond knew the facts of the decree, the status of the parties, and his renewed friendship or business relations with Fairclough, and the changed relations of Dorothy and the birth of the child. Karren v. Karren, 25 Utah, 87, 69 P. 465, 60 L. R. A. 294, 95 Am. St. Rep. 815; Barnette v. Miller, 131 Ark. 110, 198 S. W. 873; Maher v. Title Guarantee & Trust Co., 95 Ill. App. 365; Nicholson v. Nicholson, 113 Ind. 131, 15 N. E. 223.

The divorce was granted July 28, 1923, and St. Almond knew it in a short time thereafter; his bill was not filed until January 7, 1925. When the whole record is reviewed, it is a reasonable inference that the bill would never have been filed had not the interest of Fairclough changed as affecting Dorothy, the legal status of their child, who was recognized as such by the father, the latter's relations with other women, his subsequent marriage to Miss Grebbs, a young girl in Pennsylvania, and his prosecution for bigamy in that jurisdiction. This prosecution was initiated; he pleaded therein; he was represented by counsel and one of the attorneys was a witness of the same name as he who came to Birmingham to arrange for the instant suit for annulment. In that case it was stated that St. Almond was a material witness for the defendant. It was while this proceeding was being had when that attorney and one of the Faircloughs came to Jefferson county and investigated the record and filed the suit in the absence of St. Almond, who later sent his authority.

In the actions against him for bigamy and

for divorce by Dorothy, Fairclough set up as a defense the invalidity of the Alabama decree for divorce of July 28, 1923, and to that end, and for the establishment of said defenses, enlisted the aid of St. Almond. It was while some of these matters were pending that Fairclough's father and said attorney, in the fall of 1924, came to Birmingham, arranged for the instant direct attack upon the Alabama divorce decree.

The invocation of the aid of the Alabama courts was advised, financed, arranged, and procured by Fairclough, the father of Kingston. His parents were theretofore married, and remarried, after the divorce in Alabama. This child by the marriage, and his recognition by the father, rendered him legitimate and subject to the laws of inheritance. Code of 1907, § 5199; New York vol. 1, Consol. Laws, Domestic Relations, § 24; New Jersey Comp. Stat. vol. 2, p. 1923, § 13.

The Faircloughs lived together as husband and wife until the husband's associations with other women brought about a separation and proceeding for divorce by Dorothy, and the marriage of the husband to Miss Grebbs.

In a word, the position of appellant on that proof of the issuable facts alleged in the bill for divorce by perjured testimony, as to the time of residence, is not such fraud as will authorize the setting aside of the decree under the circumstances we have indicated, and at the instance of such guilty party or parties. In determining his right to maintain this suit we cannot escape the conclusion that Fairclough is the real party in interest in the bill of review and, as such, actuated the fraud and participated in the result in procurement of the decree directly attacked. He is bound by it and estopped to question its validity. And St. Almond, with a knowledge thereof, delayed action in the premises for such a period and under such circumstances of co-operation with Fairclough, and after the remarriage of the parties and birth of their child, that this prevents his pressing the bill of review in his and Fairclough's behalf.

We believe, and have so treated, the question, whether our court, having been once deceived, shall now be again deceived by him under another's name, and made to set aside the divorce procured by him with the disastrous effect of bastardizing the innocent victim of Fairclough's relations with Dorothy.

The trial court was in error, and that decree is reversed and a decree here entered dismissing the bill.

Reversed and rendered.

ANDERSON, C. J., and SOMERVILLE and BROWN, JJ., concur.

