## Commonwealth v. Case

*Cadwallader, Darlington & Clarke* and *T. Sidney Cadwallader*, for Commonwealth.

*Begley, Carlin, Mandio, Kelton & Popkin* and *William J. Carlin*, for defendant.

MONROE, J., August 3, 1962.—Defendant, Russell J. Case, is being charged with violation of section 733 of The Penal Code of the Commonwealth of Pennsylvania in that he has failed to support his wife, Hellene R. Case. Defendant was formerly married to Elma Case; on February 3, 1961, he secured a "Final Decree of Divorce" from her in Geneva County, Alabama. Prosecutrix was formerly married to Robert Lanning Kulp; on February 4, 1961, she secured a "Divorce Decree" from him in Covington County, Alabama. A general appearance for both spouses is noted in the decrees which are incorporated in the record. On February 17, 1961, Russell J. Case and the prosecutrix were married in Morrisville, Bucks County, Pennsylvania.

Defendant denies that the divorce decrees obtained by the parties in Alabama were valid because of the fraud committed on the courts in Alabama and, hence, contends that he is not now legally married to the prosecutrix. Both the divorce decrees contained a provision prohibiting each party thereto from remarrying except to each other for a period of 60 days.

On this phase of the case, there is no real conflict in the testimony of the prosecutrix and defendant. They had been "going together" for approximately two years prior to February, 1961. Mr. Case gave Mr. Kulp a check for $10,000 for Mr. Kulp's share of the Kulp residence at 1911 Yardley Road, Yardley, Pennsylvania. During the last week of January or the first week in February, 1961, the exact date is uncertain, Mr. Case and Mrs. Kulp left together by car for Montgomery, Alabama, to obtain divorces from their respective spouses. They stayed in a Montgomery motel for two nights. Both Mr. Case and Mrs. Kulp went to the same Montgomery attorney recommended to Mr. Case by his company attorney. It was Mr. Case's idea that the parties should get their divorces in Alabama.

After one visit to the attorney's office in Montgomery, the parties left Montgomery, picked up Mrs. Kulp's daughter in Virginia and returned to Bucks County.

Prior to the Montgomery visit, Mr. Case lived in an apartment in Morrisville, Bucks County; Mrs. Kulp lived in the 1911 Yardley Road house in Yardley, Bucks County. Prior to leaving for Montgomery and on her return therefrom, Mrs. Kulp was operating her own business in Trenton, New Jersey. Its operation was discontinued in January of 1962. Mr. Case has been continually employed by a corporation manufacturing pork meat products, in Trenton, New Jersey. Both parties testified that they had never been to Alabama prior to this trip, did not own any property in that State, and had never established a residence there for voting purposes.

From the foregoing, it is clear that the Cases perpetrated a fraud on the courts in Alabama as they were never good-faith residents in that State. It is equally clear that the full faith and credit clause bars a defendant from attacking a divorce on jurisdictional grounds in the courts of a sister State where both spouses have submitted themselves to the personal jurisdiction of the courts of the rendering State and the decree is not subject to such attack in the courts of that State: Sherrer v. Sherrer, 334 U. S. 343, 92 L. Ed. 1429 (1948); Coe v. Coe, 334 U. S. 378, 92 L. Ed. 1451 (1948). Compare Harrison v. Harrison, 183 Pa. Superior Ct. 562 (1957). Mr. Case, therefore, cannot attack the validity of his own divorce decree in this proceeding, if he could not do it in Alabama. In Alabama, a spouse may not attack a collusive divorce where he himself participated in the collusion: Wright v. Wright, 230 Ala. 35, 159 So. 220 (1935).

The leading case is Levine v. Levine, 262 Ala. 491, 80 So. 2d 235 (1955), in which a wife sought by direct attack to set aside a divorce obtained by her husband

several years earlier in an action in which she had appeared. The court held that the wife was estopped from asserting the invalidity of the divorce because she either participated in the fraud on the court or was negligent in failing to contest the residence issue.

Defendant asserts that even if he is estopped from attacking the validity of his own decree, he is not precluded from attacking the validity of the decree obtained by Mrs. Kulp. But third-party attack on a divorce decree in a sister State is dependent on its availability in the rendering State: Cook v. Cook, 342 U. S. 126, 96 L. Ed. 146 (1951). In Fairclough v. St. Amand, 217 Ala. 19, 114 So. 472 (1927), the Alabama Supreme Court held that one in privity with a person who, by fraudulent conduct, procures a divorce is estopped to question its validity. The facts in that case were similar to those in the instant case in that the second husband was seeking to have his wife's prior divorce declared invalid because of a fraud as to residence. The court held that Fairclough was the instigator of the prior suit; "His was the guilty knowledge of all the facts and the law in the premises. . . . His subsequent marriage to Dorothy after the divorce in Alabama and his recognition of the child by her are additional reasons or grounds for the estoppel against him as the real, active, guilty party in interest here": Fairclough, supra, at 473, 474.

Likewise in Mussey v. Mussey, 251 Ala. 439, 37 So. 2d 921 (1948), the court held that the husband was estopped to deny the validity of a Nevada decree, where he was the principal movant in the Nevada proceedings wherein his wife was divorced from her first husband.

In the instant case, Mr. Case admits that it was his idea that he and Mrs. Kulp should go to Alabama to obtain their divorces. And on the strength of those divorces, he married her. Since Mr. Case would be estopped in Alabama from attacking the validity of

the Kulps' divorce, he is estopped in Pennsylvania from collaterally attacking it.

Mr. Case and Mrs. Kulp were married in Pennsylvania within the 60-day prohibited period specified by their decrees. Pennsylvania follows the general rule that the validity of a marriage is determined by the law of the place where it was contracted: Commonwealth v. Custer, 145 Pa. Superior Ct. 535 (1941); Jewett v. Jewett, 196 Pa. Superior Ct. 305 (1961). This rule is applicable except where the marriage is repugnant to the public policy of the domicile of the parties, in respect to polygamy, incest or miscegenation, or is otherwise contrary to its positive laws, or is entered into in fraud or in evasion of the law of the domicile of the parties. It is abundantly clear that Pennsylvania is the domicile of the parties, the marriage occurred in Pennsylvania, and there is nothing in the laws of Pennsylvania which requires, as a matter of public policy or otherwise, a waiting period after a divorce decree.

While we have been unable to find any Pennsylvania cases analyzing the effect of the Alabama 60-day period of prohibition, the case of Van Storch v. Griffin, 71 Pa. 240 (1872), held that a New York decree of divorce which provided that the respondent would not be at liberty to marry again is inoperative in this State where the respondent has been divorced on her own libel. The decree in New York that she should not marry again could have no extra-territorial effect. See also Commonwealth v. Smith, 7 D. & C. 658.

The New York courts have had occasion to explore the meaning of the prohibition. Marzano v. Marzano, 154 N. Y. S. 2d 507 (1956), in the absence of proof of Virginia law, dealt with the validity of a Virginia marriage contracted in violation of Alabama's 60-day proscription as though the problem was governed by New York law. "Marzano held that in New York the

determining factor was whether the foreign decree was interlocutory or final, and after carefully analyzing the Alabama cases, concluded that the Alabama decree was final, and the Virginia marriage valid notwithstanding the prohibition": Olsen v. Olsen, 209 N. Y. S. 2d 503, 505 (1960). The Olsen case likewise held that the Alabama statute was penal in character and did not invalidate a New York marriage contracted prior to the expiration of the 60-day prohibition.

In the absence of bigamy or the question of public policy, the Alabama decree standing alone is treated as final: Schurink v. United States, 177 F. 2d 809 (5th Cir., 1949). In the Schurink case, plaintiff sought to recover the proceeds of two National Service Life Insurance policies issued on the life of a deceased husband who had divorced her 20 days prior to his death. The circuit court of appeals held that the Alabama decree completely and finally dissolved the bonds of matrimony as of the date it was rendered, and, on the date of the insured's death, appellant was not his widow.

Defendant relies upon Brand v. State, 242 Ala. 15, 6 So. 2d 446 (1941), and argues that on the authority thereof his marriage to the prosecutrix, within 60 days of the Alabama decree of divorce, is void. The opinion in the Marzano case, supra, effectively, we think, interprets and applies against defendant the not abundantly clear opinion in the Brand case. While, of course, we are not controlled by the Marzano decision, we believe it correctly interprets the Brand decision, and we accept its interpretation without repetition or further discussion thereof.

One further question remains. Should this court ex mero motu, or sua sponte, declare the Alabama divorces invalid? In the recent case of Hartigan v. Hartigan, 128 So. 2d 725 (1961), the Supreme Court of Alabama

held that the Circuit Court of Jefferson County had the power to vacate, of its own motion, the divorce decree rendered by the court in 1954, not void on its face, when, in 1960, it was shown in an adversary proceeding between the same parties to modify the decree, when both parties were physically before the court, that the 1954 decree was void because the court did not have jurisdiction of the subject matter. The Hartigan case was distinguished in Aiello v. Aiello, 133 So. 2d 18 (1961), in that in the Aiello case both parties to the prior decree were not in court, and the party who was in court was objecting. In the Hartigan case, without objection by either party, facts were established to show the fraud practiced on the court. The Aiello case held that the husband's bill in equity, praying that the court declare his 1950 marriage null and void on the ground that a 1948 decree divorcing his wife from a former spouse had been obtained by the wife's fraud as to residence, would not be demurrable if the bill could be amended to show that it had been brought within one year after the husband's discovery of the alleged fraud, and that the husband had been reasonably diligent in making such discovery.

In the instant case, Mr. Case knew of the fraud and, in fact, participated in it in February, 1961. He has taken no affirmative steps to have the Alabama divorce decree invalidated. In fact, in January, 1962, he filed, in the court of common pleas of this county, a complaint for divorce a. v. m. against the prosecutrix, which recognized his marriage. He cannot now, as a defense to this action for support, assert the invalidity of his prior divorce, nor should this court as a matter of public policy assist him in profiting by his own wrong doing. The instant case is also distinguishable from the Hartigan case in that the two former spouses of the present parties are not before this court and would be directly affected if the court were to declare these divorces

invalid. In the Hartigan case, both parties to the collusive divorce were before the court.

Defendant also relies upon Commonwealth ex rel. Allison v. Allison, 151 Pa. Superior Ct. 369 (1943), and Commonwealth ex rel. Wenz v. Wenz, 195 Pa. Superior Ct. 593 (1961), both of which are readily distinguishable; the former because it was admitted that the prosecutrix in the proceeding for support under section 733 of the Criminal Code was not the wife of defendant therein and because defendant's divorce, which was in question, was obtained in Mexico and, consequently, not entitled to full faith and credit under the Federal Constitution; the latter, because, said the Superior Court, defendant-husband had not sustained his burden of proof that he was not domiciled in the foreign State at the time of his divorce from his first wife therein, and that his first wife had notice of that proceeding, but if it be conceded that he had sustained the burden of proof, his second wife, the prosecutrix, in good faith entered into marriage with defendant and, hence, the marriage to her was valid because the first wife of defendant had obtained a valid divorce from him after his marriage to the prosecutrix: Act of August 22, 1953, P. L. 1344, sec. 17, 48 PS §§1-17. Additionally, in the Wenz case, it did not appear that defendant's first wife had submitted to the jurisdiction of the foreign State in defendant's divorce action against her. Therefore, the court was not called upon to adjudicate the impact of Sherrer v. Sherrer and Coe v. Coe, supra.

While we do not condone the action of Mr. Case and Mrs. Kulp in working a fraud on the Alabama courts, we will leave them in the position in which they put themselves.

Having determined the liability of defendant to support his wife, we turn to the function of this court to fix an amount which is reasonable and proper for her

comfortable support and maintenance, not exceeding one-third of the defendant's income, and taking also into consideration the nature and extent of his property and other financial resources: Commonwealth ex rel. Rankin v. Rankin, 170 Pa. Superior Ct. 570, 572 (1952).

Relatrix is residing in a home presently titled in the names of both parties as tenants by the entireties, a property which was formerly the home of and owned by relatrix and her first husband, Robert Kulp, whose interest therein the defendant purchased for $10,000.

Defendant owns a half interest in and is an officer of a corporation manufacturing pork meat products, (hereinafter referred to as the corporation) at Trenton, New Jersey, receiving by way of salary and bonus $25,000 per year. The number and value of his shares therein does not appear from the testimony. The corporation has not paid dividends in 1961 and 1962. Relatrix testified that defendant's receipts by way of salary and bonuses from the corporation aggregate $28,000 a year, but the evidence does not support this statement. Evidently, for the purpose of showing that the corporate income will be less in 1962 than previously and, consequently, that he will not receive a bonus for the calendar year 1962, defendant presented in evidence statements allegedly reflecting the corporate income and expenses for the first quarter of each year from 1959 to 1961 inclusive. In our opinion the exhibits do not establish the conclusion sought. The statement for the first quarter of 1961 shows a loss for 1961, nevertheless a bonus was granted. The exhibit is otherwise inconclusive.

Defendant also owns one hundred shares of General Motors Corporation, of the value of $5,000; 100 shares Kearney and Trecker, value $900; 100 shares Standard Packaging Company, value $1,500. In 1961, General Motors Corporation paid dividends of $250 on defend-

ant's stock holdings. The other two corporations have paid none.

Defendant's 1961 Federal income tax return shows interest paid to him: "1st Trenton Natl. $505.60, Broad St. Natl. $227.53". He was not questioned with respect thereto on direct or cross examination. We assume the references are to two banking institutions in the City of Trenton, New Jersey. In the absence of satisfactory explanation we will also assume that the factual situation will continue and that he will be paid like interest, by the two institutions, for the year 1962. Perhaps an attempted explanation was made. Defendant testified that when he married relatrix he had $26,000 in cash, and of that he had left at the time of testifying $2,100 in a savings account and $65 in a checking account. However, he did not, in so testifying, relate this vanishing asset to the entries upon his tax return.

It would therefore appear that defendant has a substantial sum upon which the First Trenton National and Broad Street National are paying interest totalling $733.13 per annum. Since the rate of interest is not established by the evidence, if it is assumed to be six percent, it follows that the sum would approximate $12,000, and, obviously, the lower the interest rate the larger the sum.

Defendant's 1961 Federal income tax return reports gross income of $25,933.13, representing the salary, bonus and interest mentioned, and also the General Motors Corporation dividend less $50 exclusion thereon allowed by the Revenue Code. Relatrix also testified that defendant receives additional income by tax subterfuges and evasive practices of her husband and the other principal shareholder of the corporation through rebates and kickbacks on insurance premiums, falsified expenses for travel, entertainment, and fire and robbery losses, charged against the corporation.

Defendant has denied this. The amounts, as to the present and future, being speculative and the proofs thereof lacking conviction, we are not persuaded that defendant derives income from such practices.

Also, relatrix has testified that reprocessed pork roll wrapped in unmarked packages is sold weekly, through a salesman travelling a door-to-door route, and that sales are not entered upon the corporation records but that the profits therefrom are divided between defendant and the other principal shareholder of the corporation; that defendant's weekly share of the profits range from $170 to $250. Relatrix's knowledge of this is from statements made to her by defendant prior to their marriage, from statements made in her presence and by defendant after their marriage accompanied by displays of the profit, on occasion. The fact that there is such a sales route she established by following, in the company of a detective, who also testified, the salesman on two occasions shortly before the hearing herein. Defendant does not deny that such a route exists or that sales are made. He says, however, that he has no interest in the route. He and his witness, sales manager of the corporation, say that the corporation gives the reprocessed and waste meat products to one of the employes of the corporation who reprocesses it and sells it on his own, using on the route a truck owned by him but marked with the corporation name and neither the corporation nor the defendant has any financial interest in the reprocessed pork rolls, the route, or the profits thereof. We are unconvinced by their testimony, particularly in the unexplained absence of the salesman who, as an employe of defendant's corporation would be readily available to him and who has a first hand knowledge of the disposition he makes of the proceeds of the route. We therefore conclude that defendant has a weekly income of $170 or $8,840 a year from this source.

It, therefore, appears that defendant's gross income is $25,983.13 representing salary, bonus, dividends and interest and $8,840 from reprocessed pork roll sales, or a total of $34,823.13. His accountants have estimated his social security and New Jersey taxes at $172.50, income tax at $6,350, not taking into consideration tax on income from reprocessed pork roll sales, which, if taken into consideration would result in Federal and New Jersey taxes approximating a total of $8,500.

Defendant has submitted a list of living expenses aggregating $9,725.22. It includes $2,104.22 expenditures in payment of mortgage charges and annual taxes upon the entireties residence occupied by relatrix. While it contains various items of expenditures which in themselves we would consider excessive, notably medical, nevertheless, the overall outlay does not appear to us to be unreasonable for a man in defendant's position in business.

In addition to the living expenses defendant is obligated to pay to the first Mrs. Case $7,200 per annum by virtue of a written property settlement agreement entered into with her upon the fragmentation of that marriage. Relatrix has admitted that she knew of this obligation of defendant's prior to the time that she married him. In determining the amount of the order to be made we may consider all the attendant circumstances: Commonwealth v. Sgarlat, 180 Pa. Superior Ct. 638 (1956). Relatrix's knowledge, prior to the time of her marriage to defendant, of this drain upon his income, we have considered in determining the amount of the order hereafter made.

According to our calculations, therefore, defendant's gross income approximates $34,823.13. His Federal and New Jersey tax liability approximates $8,500 per year, his annual liability to his former wife $7,200, netting to him approximately $19,123.

The order for the support of the wife may not exceed one-third of the husband's total income: Commonwealth ex rel. Milne v. Milne, 150 Pa. Superior Ct. 606 (1942). In Commonwealth v. Sgarlat, supra, an order totalling slightly less than one-third the husband's gross income was approved. However, we are not persuaded that relatrix requires one-third of either the gross or net income of defendant in order to live as she comfortably did the few months she and her husband resided together at their Yardley home.

Relatrix lists expenses of $894.03 per month or $208.60 per week as reasonably necessary for her comfortable support and maintenance. Included therein are monthly payments of $133.03 and $37 for mortgage liquidation and taxes on the entireties home, both of which obligations are being paid by defendant. Eliminating extended discussion, the bona fides of her expenditures for car rental, clothing and accessories, food, cleaning and laundry, beauty parlor, and miscellaneous items, was considerably shaken by her cross examination and later testimony. For example, her testimony discloses that during the eight blissful marital months during which she resided with defendant and he with her, the defendant paid her $125 per week from which she paid all of the expenses which she has listed in this case, including the mortgage installments and part of the taxes, but excepting the gardener's pay, the doctor's bills, donation and car rental.

Accordingly, we make the following

### Order

And now, August 3, 1962, defendant, Russell J. Case, is ordered and directed to pay to the Bucks County support officer, for the support of his wife, Hellene Roberta Case, the sum of $120 per week, each and every week hereafter, and additionally that he pay promptly whenever due and payable all taxes assessed

and levied upon the entireties real estate standing in the name of himself and his said wife and situate at 1911 Yardley Road, Yardley, Bucks County, Pennsylvania as well as all payments that shall hereafter fall due and payable on account of principal and interest of the mortgage presently liened upon said real estate, all until the further order of this court; that he enter into his own recognizance in the sum of $2,000 conditioned upon his faithful compliance with this order; that he stand committed until the same is complied with.